**Laurie Ann HARGRAVE, Plaintiff,**

v.

**COUNTY OF ATLANTIC, Sal Martello, Joyce Ross, Wilt Bennet, Geri Oaks, and John Doe 1 through 10, Defendants.**

Civil Action No. 00–2568(SSB).

United States District Court,
D. New Jersey.

May 12, 2003.

Frank L. Corrado, Esq., Joseph C. Grassi, Esq., Rossi, Barry, Corrado & Grassi, P.C., Wildwood, NJ, for Plaintiff Laurie Ann Hargrave.

Donna M. Taylor, Esq., Assistant County Counsel, Atlantic County Department of Law, Atlantic City, NJ, for Defendants County of Atlantic and Wilt Bennet.

Arthur J. Murray, Esq., Jacobs & Barbone, P.A., Atlantic City, NJ, for Defendant Salvatore Martello.

Katherine D. Hartman, Esq., Attorneys Hartman, Chartered, Moorestown, NJ, for Defendant Joyce Ross.

Karen M. Williams, Esq., Jasinski and Paranac, P.C., Atlantic City, NJ, for Defendant Jeri Oaks.

BROTMAN, District Judge.

Plaintiff Laurie Hargrave, an African–American female, instituted this action against Defendant Atlantic County, her former employer, and several of her former supervisors on May 26, 2000, alleging that she was subjected to a racially and sexually hostile work environment and unlawful retaliation in violation of Title VII (Count I) and the New Jersey Law Against Discrimination ("NJLAD") (Count III). Plaintiff also asserts claims under 42 U.S.C. § 1983 based on the alleged violation of rights guaranteed her under the Equal Protection and Due Process Clauses of the Fourteenth Amendment (Count II). The Court has jurisdiction over Plaintiff's federal civil rights claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Presently before the Court are Defendants' motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' motions will be granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Laurie Hargrave, an African-American female, was hired by Defendant Atlantic County in 1986 to work as food service worker in the Dietary Unit of the Meadowview Nursing Home ("Meadowview") in Northfield, New Jersey, a position she occupied until her discharge in August of 2001. (Hargrave Dep. at 12:17–22). Meadowview provides assisted living quarters for the elderly and is operated through the County's Department of Human Services. The facility's Dietary Unit is a "satellite unit" which receives food cooked elsewhere on the premises and arranges it on "steamtables" for distribution to the facility's elderly residents, many of whom have special dietary and nutritional needs. (*Id.* at 14:2–16:5). The Unit's staff of approximately ten to twelve food service employees work in two shifts, a morning and an afternoon shift, under the direct supervision of a Food Service Manager ("FSM") and, occasionally, an assistant FSM. (*Id.* at 16:6–16; 18:17–19:7). The precise composition of the Unit's staff varied over the course of Plaintiff's employment, but has generally consisted predominantly of African American female food service workers and a mostly non-minority staff of managers and supervisors. (Purelli Dep. at 19:25–20:10; Maurer Dep. at 18:8–14; Hopkins Dep. at 21:3–21:6).

### Plaintiff's Allegations of Hostile Work Environment Sexual Harassment and Retaliation:

In 1995, Atlantic County hired Defendant Salvatore Martello ("Martello"), a caucasian male with private sector experience in food service management, to fill the position of Food Service Manager. (Martello Dep. at 8:10–10:3). Martello's tenure was, according to Plaintiff, marked almost from the start by inappropriate conduct toward the Unit's female employees. On March 1, 1996, Plaintiff memorialized her complaints about Martello's conduct in a memorandum which she directed to Susan DeMos, the Director of Support Services at the County's Human Services Department, and distributed to various members of the Unit's managerial staff, including Martello himself. (See Memorandum dated March 1, 1996, attached as Ex. D to .Def.'s Joint Stmt. of Facts). In her memo, Plaintiff accused Martello of making several offensive and sexually suggestive comments and jokes to her and her female co-workers. The memo specifically identified four statements Martello had allegedly made over a period of approximately five and one-half months. What follows is a series of excerpts from that memorandum:

TO: SUSANNE DEMOS

FROM: LAURIE HARGRAVES

DATE: MARCH 1, 1996

RE: SAL MARTELLO/SEXUAL HARASSMENT

This memo is to apprise you of the conditions and the environment that we must endure working under the supervision of Sal Martello. Below are various incidents that were either told to me or I have witnessed in regards to the conduct unbecoming a supervisor.

. . .

**September 14, 1995**

Approximately 11:30 or 12:30, Mrs. Wanda Harris came to me and repeated a disgusting comment Sal had made. In the office of the Dietician, Diane Frakas had cooked Sushi. They were tasting it. Sal made the statement that **"the Sushi tasted better than a woman he had."**

In my presence, during the month of September at 11:00 a.m., an employee entered Sal's office. Sal stated to the employee **"You look so good, baby, I could put you on a plate and slop you up with a biscuit."**

**December 29, 1995**

A Friday, at 12:40 I had completed serving lunch and was emptying the steamtable.

Barbara Bennet entered the kitchen and asked for Sal. I told her he was out to lunch. She asked if we (Wayne Leggett and myself) would taste some shrimp because they smelled bad. Wayne went to check on the shrimp. When Sal returned from lunch around 1:30, I informed him that Barbara wanted him to smell and taste some shrimp because they had smelled bad. Sal left. Sal returned within 10 minutes. As I was cleaning off my steam table, washing it down, Sal came in laughing, he stopped right in front of our starting station, and stated (laughing) **"Barbara Bennet wanted me to taste shrimp, if anyone knows what fish taste like she should know, she eats more fish than I do."** [1]

. . .

**February 21, 1996**

About 7:00 a.m. Martha McCusker brought to my attention a very degrading and disgusting statement Sal made in her presence. She stated that he said **"I always hit that "G" spot."** . . .

. . .

I'm sure you can appreciate the seriousness of this situation and it is time for a change. No one should have to work under these conditions.

I am requesting a meeting with you and Sal along with my representative to discuss this matter. A suit for sexual harassment has not yet been filed, however, it will depend upon the outcome of this meeting with you.

You immediate attention to this matter will be most appreciated.

(*Id.*) (emphasis in original). Plaintiff's memo also identified at least two other female employees who had allegedly voiced similar complaints about Martello's "sexual [sic] offensive jokes and statements," though it did not provide any details with regard to the specific nature and substance of those comments. (*Id.*).[2]

At her deposition testimony, Plaintiff related three additional incidents in which Martello made sexually offensive remarks, comments she had not specifically included in her March 1st memorandum. For instance, Plaintiff testified that Martello had once explained to her that the reason a woman sits with her legs open on the back of a motorcycle is "because when she hits bumps along her ride, there is like a sensation or vibration that she gets." (Hargrave Dep. at 44:17–45:13). Plaintiff also discussed an incident in which Martello boasted about a party he had attended in Philadelphia where he could have "laid" or "screwed" all the women he wanted. (*Id.* at 435:4–9). Finally, Plaintiff testified that Martello "often" told jokes about a blind man who passes a fish market, the point of which was that female genitalia smells like raw fish. (*Id.* at 43:7–25).[3]

---

1. In her deposition testimony, Plaintiff explains that she understood this as a thinly veiled reference to rumors that Bennet was a homosexual. (Hargrave Dep. at 47:7–48:1).

2. In her memo, Plaintiff claimed that Martha McCluster, one of Plaintiff's co-workers in the Dietary Unit, had "complained about [Martello's] nasty sexual offensive jokes and statements" during a conversation the two had on August 17, 1995. (*See* Memorandum dated March 1, 1996, attached as Ex. D to Def.'s

Joint Stmt. of Facts). She also stated that another female employee, Guanne Maye, had told her and other "breakfast line employees" that "it becomes real raw and disgusting with Sal's remarks" during the afternoon shift. (*Id.*).

3. At her deposition, Plaintiff testified that, while she did not attempt to confront Martello directly about his offensive comments and jokes, she did make a conscious effort to "avoid" him. (*Id.* at 44:21–24).

On March 5, 1996, shortly after circulating copies of her memorandum, Plaintiff filed a formal complaint of sexual harassment with the Atlantic County Department of Law. (*See* EEO Report dated March 21, 1996, attached as Ex. 8 to Pl.'s Stmt. of Facts). Plaintiff's complaints prompted an investigation by Donna Nelson, an Equal Employment Opportunity (EEO) officer employed by the Atlantic County Department of Law. As part of the investigation, Martello was suspended for two weeks and instructed not to speak with anyone regarding the allegations against him until the County had completed its investigation. (Martello Dep. at 16:25–17:4). Nelson investigated Plaintiff's allegations and interviewed several members of the Meadowview staff, including several of the food service workers identified in Plaintiff's letter, as well as employees outside the dietary unit who had had some contact with Mr. Martello. (Pl.'s Stmt. of Facts, Ex. 8). In a letter dated March 21, 1996, Nelson reported that her investigation had uncovered "insufficient evidence to support a finding of frequent and severe or pervasive activity giving rise to hostile environment sexual harassment." (*Id.*).

Plaintiff's allegations did not result in any formal disciplinary action against Martello. He did, however, receive a letter from DeMos reminding him that, as supervisory employee, he was expected to "make a conscious effort to act in a professional manner" and to "ensure that [his] behavior and actions are never questionable." (See internal memorandum dated March 14, 1996, attached as Ex. 10 to Pl.'s

Stmt. of Facts). DeMos's letter also emphasized that inappropriate "jokes, innuendos, profanity, and foolishness must not be tolerated in the workplace" and recommended that Martello use the "episode [involving Hargrave's allegations and the subsequent investigation] as a very valuable learning experience." (*Id.*).

Plaintiff alleges that, in the months following the release of Nelson's report, Martello engaged in a pattern of "continuing harassment." Among other things, she accuses Martello of following her around the workplace, spying on her through security cameras, misinforming other supervisory staff about the nature of her job responsibilities, and falsely accusing her of taking unauthorized breaks. (Hargrave Dep. at 56:10–58:18). She also attributes poor ratings on a subsequent annual performance evaluation to Martello's anger over her sexual harassment allegations. On this evaluation, which was issued approximately six months after Plaintiff first complained about Martello's workplace behavior, Martello rated her "attitude" and "dependability" as less than satisfactory. He also criticized Plaintiff for allegedly displaying a "poor attitude" toward management and suggested that "her input would be more readily accepted/received if conveyed in a professional manner." (See Annual Performance Evaluation dated 9/9/96, attached as Ex. F of Def.'s Joint Stmt. of Facts; Ex. 3 of Pl.'s Stmt. of Material Facts).[4]

Dissatisfied with the County's response to her complaints, Plaintiff filed a formal

---

4. The Meadowview's annual evaluation form asks supervisors to rate an employee's work performance in nine separate categories: "attitude"; "dependability"; "adaptability"; "time utilization"; "safety"; "skill in designed craft"; "equipment care and maintenance"; "equipment operation"; and "initiative." While Plaintiff had received low marks in the "dependability" category on two earlier

evaluations, Martello's 1995/1996 annual performance evaluation was the first evaluation to fault her for purportedly exhibiting a "poor attitude" toward the Dietary Unit's managerial staff. Indeed, Martello's 1994/1996 evaluation had rated Plaintiff's work performance as "satisfactory" or better in all nine categories. (*See* Ex. 3 of Pl.'s Stmt. of Material Facts).

charge of discrimination with the Equal Employment Opportunity Commission on October 1, 1996. (*See* EEOC Charge # 170970003, attached as Ex. 9 to Pl.'s Stmt. of Facts). In her complaint, Plaintiff reiterated allegations that she and several of her female co-workers had been "verbally sexually harassed" by Martello and accused the County of failing to conduct a thorough inquiry into these complaints.[5] (*Id.*). She also accused Martello of retaliating against her for voicing complaints about his inappropriate workplace conduct. (*Id.*).

On April 1, 1997, Martello confronted Plaintiff and Doris Hobdy, one of Plaintiff's coworkers, and accused the two of them of taking an "unauthorized" break. (Hargrave Dep. at 60:14–62:25). Plaintiff denied any wrongdoing and requested a meeting with Herman Cruse, the County's Assistant Director of Support Services, to discuss the incident. (*Id.* at 61:19–62:25; 63:1–11). A meeting was held later that afternoon in Martello's office and was attended by Plaintiff, Hobdy, Martello, Cruse and union president Carolyn Lambert. (*Id.* at 63:4–15). By all accounts, this meeting did not go well.

Plaintiff was invited to speak first, as she had been the one who requested the meeting. (Hargrave Dep. at 64:17–23). She attempted to explain why Martello had been wrong to accuse her and her coworker of taking an "unauthorized" break. (*Id.*). The meeting, however, quickly degenerated into a shouting match when Martello suddenly stood up, leaned over his desk, thrust his finger in Plaintiff's face, and began screaming at her. He allegedly denounced Plaintiff as a "liar" and a "zero" and openly taunted her about the fact that her previous complaints of sexual harassment had not resulted in any disciplinary action against him. (*Id.* at 64:16–66:6; Cruse Dep. at 25:8–12). At one point, in the midst of this tirade, Martello "gestured toward" Plaintiff in a physically threatening manner "as if he were going to strike her." (Hargrave Dep. at 66:12–67:3). Indeed, Martello allegedly became so belligerent that he had to be physically retrained by Herman Cruse. (Cruse Dep. at 28:18–22).

Plaintiff reported the incident to both Susan DeMos, the County's Director of Support Services, and Susan Gross, an assistant counsel in the County's EEO office. (*See* EEOC Charge # 170980567, attached as Ex. 18 to Pl.'s Stmt. of Facts). Plaintiff also submitted a written complaint to Samuel Stetzer, head of the County's Department of Human Services, Joyce Ross, the department's deputy director, and County Executive Richard Squires. (*Id.*). In the days following the incident, Plaintiff tried, unsuccessfully, to meet with DeMos to discuss Martello's allegedly threatening and intimidating outburst. (DeMos Dep. at 31:5–32:8). She also filed a formal grievance with her union representative, Levon Vonner, which he then forwarded to Herman Cruse. (*See* Official Grievance Form dated April 5, 1997, attached as Ex. 13 to Pl.' Stmt. of Facts; Hargrave Dep. at 70:6–12). However, this grievance was misplaced and later summarily dismissed on the grounds that it had been untimely filed. (*See* Inter–Office Memo dated June 27, 1997, attached as Ex. 15 to Pl.'s Stmt. of Facts; Cruse Dep. at 40:1–41:8; Hargrave Dep. at 340:9–343:11).

DeMos, the County's Director of Support Services, also received a report about the incident from both Martello and Cruse.

---

**5.** Plaintiff refused to accept Nelson's findings and accused County of failing to conduct a thorough inquiry into her allegations. She claimed that Nelson had disregarded repeated requests that she interview several employees whom Plaintiff believed to possess pertinent information about the Martello's alleged harassment. (Hargrave Dep. at 50:14–51:9).

(DeMos Dep. at 26:10–19). Martello, for his part, insisted that it had been Plaintiff who had instigated the incident and sought to have her disciplined for her behavior. (Martello Dep. at 40:22–42:1; Maurer Dep. at 28:1–6; DeMos Dep. at 25:21–26:19). While he acknowledged yelling at Plaintiff, he claimed to have done so only after she stood up, pointed her finger in his face, and began screaming at him. (Martello Dep. at 40:22–42:1; 44:6–18).

In an internal memorandum dated April 16, 1997, DeMos chastised Martello for losing his composure and warned him that she considered his behavior "completely inexcusable and unacceptable." (Memorandum from DeMos to Martello dated April 16, 1997, attached as Ex. 16 to Pl.'s Stmt. of Facts). She did not, however, recommend that he be subjected to any formal disciplinary action. (Martello Dep. at 44:19–25). Plaintiff, on the other hand, was later cited by DeMos for "insubordination" and "conduct unbecoming a public employee" and suspended for a period of five days. (Notice of Minor Disciplinary Action dated 4/18/97, attached as Ex. 17 to Pl.'s Stmt. of Facts; DeMos Dep. at 26:20–28:7).

Martello was briefly reassigned to another location at the Meadowbrook facility, but was permitted to return to the Dietary Unit approximately one week later. (*See* EEOC Charge dated April 27, 1998, attached as Ex. H to Def.'s Joint Stmt. of Facts). According to Plaintiff, upon his return, Martello promptly resumed his efforts to harass and intimidate her. Indeed, at her deposition, Plaintiff testified about two specific incidents which occurred on April 8, 1997, the very day Martello returned to the Dietary Unit. In one incident, she was serving food at one of the steamtables in the cafeteria, when Martello came out of his office and stood behind her, pinning her between himself and the serving table. (Hargrave Dep. at 74:17–77:25). He remained in that position, pressed up against Plaintiff's backside, despite her repeated requests that he move. (*Id.*). Later that afternoon, toward the end of Plaintiff's shift, Martello confronted her at the back entrance to the kitchen. He "walked into" her and then positioned himself in front of the exit and stood "within inches" of her face, silently staring at her. (*Id.* at 78:3–79:1). He remained in this position until Plaintiff managed to maneuver around him, retrieve her pocketbook, and leave the kitchen. (*Id.*).

Plaintiff subsequently reported both of these incidents to Susan Gross. (*Id.* at 79:7–22). In a meeting with Gross on April 25th, she expressed concern about Martello's "threatening" behavior and told her she could no longer tolerate working under his direct supervision. (*Id.* at 79:20–80:6; EEOC Charge # 1709980567). She also provided Gross with written statements from Eleanor King and Martha Purelli, two co-workers who had allegedly witnessed Martello's conduct. (Hargrave Dep. at 81: 1–9). At the end of the month, Martello resigned his position as the Dietary Unit's food service manager. (DeMos Dep. at 40:8–10).

On April 27, 1998, Plaintiff filed a second complaint with the EEOC. (*See* EEOC Charge # 1709805, dated April 27, 1998, attached as Ex. H to Def.'s Joint Stmt. of Facts). She alleged that she had been "harassed, humiliated, and intimidated" by Martello, and ultimately "suspended in retaliation for filing a previous charge of discrimination with the EEOC." (*Id.*). She also alleged that she had been the victim of "racial discrimination," though she did not set forth any specific facts to support this claim. (*Id.*).

The Philadelphia District Office of the EEOC issued its findings with respect to Plaintiff's complaints of sexual harassment and unlawful retaliation approximately one

year later. (*See* EEOC Determination letter dated April 9, 1999, attached as Ex. 19 to Pl.'s Stmt. of Material Facts). In its report, the EEOC "determined that the evidence obtained during [its] investigation establish[ed] a violation of [Title VII of the Civil Rights Act of 1964] in that based on the unprofessional, abusive and provoking behavior of Food Service Manager [Martello], against whom a previous charge had been filed, [Plaintiff] was subjected ... to a hostile work environment." (*Id.*) The report further concluded that the five day suspension she had received following Martello's outburst at the April 1st meeting constituted retaliation for filing a previous charge of sexual harassment with the agency. (*Id.*).

### Plaintiff's Allegations of Racial Harassment and Retaliation:

Shortly after the release of the EEOC's report in April 1999, Plaintiff "began to have trouble with" Jeri Oaks, a caucasian female whom Meadowview had hired in August 1997 to serve as an assistant food service manager. (Pl.'s Stmt. of Facts at ¶ 116). According to Plaintiff, Oaks frequently "talked down" to her and the rest of the Unit's predominantly African American staff by collectively referring to them as "you people." (Hargrave Dep. at 371:18–22; Swaggerty Dep. at 20:3–21:18; 50:24–54:6; Forbey Dep. at 16:8–22:22; Purelli Dep. at 17:20–20:13; 52:18–54:6; Hopkins Dep. at 56:21–58:9). Oaks was informed by Masolene Hopkins, one of the Unit's union representatives, that several of the Unit's African American employees considered her use of this phrase racially offensive and derogatory, but nevertheless continued to address the Unit's staff in this manner. (Hopkins Dep. at 20:9–21:22; 53:11–14; 56:21–58:9).

Plaintiff also accuses Oaks of giving "preferential treatment" to Frances Piehs, one of her white female co-workers. (Hargrave Dep. at 236:25–239:17). She claims that Oaks frequently allowed Piehs to sit in her office for extended periods of time. (*Id.* at 237:2–9). She also points to an incident in which Oaks allegedly permitted Piehs to read the vacation slips of other kitchen workers." (*Id.* at 83:1–84:21).

Plaintiff twice got into heated arguments with Oaks in response to what she describes as Oak's rude and unprofessional behavior and allegedly disrespectful attitude toward the Unit's staff. The first incident occurred in October 1999, on a day when the morning shift was short-staffed. (*Id.* at 90:11–96:11). Plaintiff made several attempts to locate Oaks, who was the assistant FSM on duty that morning, and eventually discovered her sitting in an office talking with a member of the Meadowview's nursing staff. (*Id.*). Plaintiff told Oaks that several employees had "called out" and explained that her assistance was needed in working the breakfast line. (*Id.*). When Oaks dismissed Plaintiff's concerns and insisted that she and the rest of the staff could manage the breakfast line without her, the two got into a heated verbal exchange. (*Id.*).

Plaintiff later filed a grievance against Oaks with her union representative. (*Id.* at 97:3–6). The nurse in whose office the altercation had taken place also filed a complaint and accused Plaintiff of violating the County's rules against "violence in the workplace."(*Id.* at 96:12–20). Plaintiff acknowledges that both she and Oaks "raised their voices," but insists the argument did not involve any physical violence or threat of violence. (*Id.* at 95:24–96:11). The incident was investigated by Donna Nelson Lee, the County's director of Human Resources, but neither Plaintiff nor Oaks were ever formally counseled or otherwise disciplined for their behavior. (*Id.* at 97:7–98:11).

In February 2000, Plaintiff got into another argument with Oaks after allegedly

observing her drag and kick another employee's coat around the floor of the employee lockerroom. (*Id.* at 226:7–228:1). Plaintiff confronted Oaks and chastised her for not respecting other people's property. (*Id.* at 228:13–19). Oaks insisted that she was simply putting the coat away so that it would not clutter the lockerroom. (Oaks Dep. at 24:8–25:21). Oaks met with Wilton Bennet, Meadowview's chief administrator, later that day and reported that Plaintiff had walked up to her, to the point where their chests were touching, and repeatedly yelled at her. (*Id.*). Plaintiff, however, denies that the incident involved any "yelling" or "touching." (Hargrave Dep. at 229:14–18; 230:5–17).

On February 23, 2000, the County served Plaintiff with a Preliminary Notice of Disciplinary Action seeking her termination and removal. (*See* Notice of Disciplinary Action dated 2/23/00, attached as Ex. 27 to Pl.'s Stmt. of Facts). This notice made reference to Plaintiff's confrontation with Oaks on February 18th and accused her of "engaging in aggressive and hostile language and behavior." (*Id.*). The Notice also indicated that Plaintiff had previously been counseled regarding the County's rules prohibiting "violence in the workplace," a statement which was later determined to be false. (*Id.*; Hargrave Dep. at 105:23–24; Ross Dep. at 43: 6–9; Nelson Lee Dep. at 31:6–16). A disciplinary hearing was scheduled but, for reasons which are not clear, was later cancelled. (Hargrave Dep. at 103:22–104:13). According to Plaintiff's testimony, this hearing was never rescheduled. (*Id.* at 104:104:4–13). Indeed, there is no evidence that this Notice ever actually result-

ed in any formally disciplinary action against Plaintiff.[6]

On March 17, 2000, Defendant Oaks met with Plaintiff to review a copy of her annual performance evaluation for the 1999/2000 employment period. (Oaks Dep. at 34:25–35:11). This evaluation, which had been prepared by Defendant Oaks, rated Plaintiff's "attitude" as "marginal," and recommended that Plaintiff work on improving her "attitude toward management." (*See* "Employee Performance Report," attached as Ex. 29 to Pl.'s Stmt. of Facts). Like the Notice of Disciplinary action Plaintiff had received in February, Oak's evaluation incorrectly stated that Plaintiff had received "verbal counseling" regarding "violence in the workplace." (*Id.*). Plaintiff refused to sign the evaluation form and demanded that Oak's remove all references to her having been counseled for violence in the workplace. (*Id.*; Oaks Dep. at 34:25–35:11).

Oaks brought Plaintiff's complaints to attention of Defendant Wilton Bennet, the Meadowview's chief administrator, and the two met with Defendant Joyce Ross, deputy director of the County's Human Services Department, to discuss Plaintiff's evaluation. (Oaks Dep. at 35:5–36:23). At this meeting, Bennet and Ross did not address Plaintiff's comments with respect to Oak's reference to workplace violence, but focused instead on critiquing other aspects of Oak's evaluation. (*Id.* at 36:24–37:2; 40: 6–10; 22–25). Bennet, for instance, questioned how Oaks could justify giving Plaintiff a "satisfactory" rating in the "dependability" category when Plaintiff's attendance record indicated that she

---

**6.** According to the evidence in the record and Plaintiff's Statement of Facts, Plaintiff took an extended period of "medical leave" to receive treatment for depression in August 2000, a few months after filing this lawsuit. (Pl.'s Stmt. of Facts at ¶ 161; Hargrave Dep. at 116:15). She never returned to work and

was ultimately terminated in August of the following year. (Pl.'s Stmt. of Facts at ¶ 161). Plaintiff has not alleged, much less pointed to any evidence, which connects her termination in August 2001 to the Preliminary Notice of Disciplinary Action she received more than a year and a half earlier.

had exhausted all of her allotted "sick days." (*Id.* at 37:6–23). After some discussion, Bennet and Ross instructed her to downgrade Plaintiff's rating to "marginal." (*Id.* at 37:6–13). They also told Oaks to adjust Plaintiff's "overall rating" from "better" to "satisfactory" to reflect the change in her "dependability" rating. (*Id.* at 38:2–16; 39:19–25). Ross, for her part, also directed Oaks not to include her comments, which offered praise for Plaintiff's work performance, in the revised version of Plaintiff's performance evaluation. (*Id.* at 41:20–42:4). She did not, however, offer any explanation for insisting on this change. (*Id.* at 42:5–24).

On March 30, 2000, Plaintiff's annual evaluation was declared "VOID" and a second "corrected" evaluation was issued which omitted any reference to workplace violence. (*See* Employee Performance Report, attached as Ex. 30 to Pl.'s Stmt. of Facts). Consistent with Bennet and Ross's instructions, this evaluation also downgraded Plaintiff's "dependability" rating from "satisfactory" to "marginal," changed her overall rating from "better" to "satisfactory," and eliminated Oak's positive comments about Plaintiff's work performance. (*Id.*).

Plaintiff once again refused to sign the form and sent a letter to Donna Nelson–Lee, the Human Resources Director, protesting these additional changes. (*See* Letter to Nelson–Lee dated April 11, 2000, attached as Ex. 31 to Pl.'s Stmt. of Facts). She also filed a formal grievance with her union representative. (*See* Official Grievance Form dated April 7, 2000, attached as Ex. 31 to Pl.'s Stmt. of Facts). Based on Nelson Lee's recommendations, a third and final evaluation was issued on April 17, 2000 which restored Oak's comments and Plaintiff's original ratings and omitted all references to "verbal counseling" for workplace violence. (*See* Employee Performance Report dated April 17, 2000, at-tached as Ex. 33 to Pl.'s Stmt. of Facts). Plaintiff's first two evaluations were thereafter officially removed from Plaintiff's file. (*See* Inter–Office Memorandum from Nelson–Lee to Ross dated April 14, 2000, attached as Ex. 32 to Pl.'s Stmt. of Facts).

Plaintiff filed a complaint with this Court approximately one month later, accusing Defendant Atlantic County and Defendant Martello of violating her rights under Title VII (Count I), the Equal Protection and Due Process Clauses of the Fourteenth Amendment (Count II), and the NJLAD (Count III). She alleged that she had experienced both racial and sexual harassment while employed at the Meadowview and claimed to have been subjected to retaliation for voicing complaints about such harassment. Plaintiff subsequently filed an Amended Complaint on September 8, 2000, which named Geri Oaks, Wilton Bennet, and Joyce Ross, as additional defendants in this action.

Each of the named Defendants now moves for summary judgment with respect to certain aspects of Plaintiff's Amended Complaint. Defendants Atlantic County, Wilton Bennet, and Salvatore Martello move for summary judgment with respect to all three counts of Plaintiff's complaint. Additionally, each of the individually named defendants—Martello, Bennet, Oaks, and Ross-have each separately moved for summary judgment with respect to Plaintiff's hostile work environment and retaliation claims on the grounds that no basis exists for holding them personally liable for the unlawful employment practices alleged in Plaintiff's Amended Complaint.

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

The standard for granting a motion for summary judgment is a stringent one, though it is not insurmountable. Rule 56

of the Federal Rules of Civil Procedure provides that summary judgment may be granted only when the evidence contained in the record, including "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.* 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there are any disputed issues of material fact which must be reserved for trial, the court must view the record in the light most favorable to the non-moving party, together with all reasonable inferences which can be drawn therefrom. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Indeed, relevant Supreme Court decisions mandate that a summary judgment motion be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict in favor of the nonmoving party.'" *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). In other words, the non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin*, 96 F.3d at 69 n. 2 (quoting

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, if the non-movant's evidence on any essential element of the claims asserted is merely "colorable" or is "not significantly probative," the court must enter summary judgment in favor of the moving party. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *see also Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991) (observing that non-movant's effort to defeat summary judgment may not "rest upon mere allegations, general denials, or ... vague statements").

## III. PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS

Counts I and III of Plaintiff's Amended Complaint assert claims for hostile work environment sexual and racial harassment under both Title VII and the NJLAD. As a general matter, the same basic principles apply when evaluating Plaintiff's claims under these two statutes.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). While the text of the statute generally makes reference to "specific employment decisions with immediate consequences, the scope of its prohibition [against discrimination in the workplace] is not limited to economic or tangible discrimination" and "covers more than terms and conditions in the narrow contractual sense." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (internal quotations and citations omitted); *see also Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (observing that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent

to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment.") Indeed, it is by now well-established that a plaintiff can demonstrate a violation of Title VII through proof that racial harassment or unwelcome sexual conduct or comments have unreasonably interfered with his or her job performance or led to the creation of an intimidating, hostile, or abusive work environment. *See Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Weston v. Commonwealth of Pennsylvania*, 251 F.3d 420, 425–26 (3d Cir.2001); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir.1996).

The Court of Appeals for the Third Circuit has articulated five factors that must be proven in order to establish the existence of an actionable hostile work environment under Title VII. Specifically, plaintiff must prove: "(1) that she suffered intentional discrimination because of her race or sex; (2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally affected

her; (4) that the discrimination would detrimentally affect a reasonable person of the same race or sex in that position; and (5) the existence of *respondeat superior* liability." *Evans v. Nine West Group, Inc.*, 2002 WL 550477 (E.D.Pa. April 15, 2002) (citing *Weston*, 251 F.3d at 426) (internal quotations omitted); *see also Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir.1999) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990)). Reduced to its most basic components, an actionable hostile work environment requires proof that Plaintiff was subjected to a level of gender or race-based harassment which was "severe or pervasive" enough to create a working environment which is both subjectively and objectively abusive or hostile to female or African American employees. *See Harris*, 510 U.S. at 21, 114 S.Ct. 367 (analyzing hostile work environment claim based on sexual harassment); *National Railroad Passenger Corp.*, 536 U.S. at 116 n. 10, 122 S.Ct. 2061 (observing that hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment.").[7]

---

7. The NJLAD, like its federal counterpart, grants employees the right to work in an environment which is relatively free from discriminatory intimidation, ridicule, and insult. *See Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 601, 626 A.2d 445 (1993) (discussing hostile work environment claims based on sexual harassment); *Taylor v. Metzger*, 152 N.J. 490, 507, 706 A.2d 685 (1998) (addressing hostile work environment claims based on racial harassment or hostility). In order to make out an actionable hostile work environment claim under the NJLAD, a plaintiff must prove that the harassing conduct about which she complains: (1) would not have occurred but for her race or gender; and that it was (2) severe or pervasive enough to make a (3) reasonable woman or African American believe that (4) the conditions of her employment have been altered and her work environment has become hostile or abusive. *See*

*Lehmann*, 132 N.J. at 603–604, 626 A.2d 445; *Taylor*, 152 N.J. at 498, 706 A.2d 685. Thus, as the Third Circuit has observed, the elements of an actionable hostile work environment claim under the NJLAD "closely resemble the first four elements of [a] Title VII hostile work environment claim." *Cardenas v. Massey*, 269 F.3d 251, 261–62 (3d Cir. 2001). Accordingly, this Court's analysis of Plaintiff's allegations of sexual and racial harassment applies equally to both her Title VII and NJLAD hostile work environment claims. *See Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 277 n. 7 (observing that "any plaintiff who has fulfilled a Title VII prima facie case will have shown the elements required by the NJLAD."); *Watkins v. Nabisco Biscuit Co.*, 224 F.Supp.2d 852, 864 n. 18 (D.N.J.2002) (Greenaway, J) (same); *see also Taylor*, 152 N.J. at 498, 706 A.2d 685 (noting that the NJLAD's "severe or

In moving for summary judgment with respect to Plaintiff's state and federal hostile work environment claims, Defendants contend that there is insufficient evidence in the record from which a jury could conclude that the conduct about which Plaintiff complains constituted harassment or discrimination on the basis of her race or gender. Defendants further argue that the conduct alleged, even if directed at Plaintiff because of her gender or race, was not sufficiently "severe or pervasive" to alter the terms and conditions of Plaintiff's employment and create an objectively hostile work environment actionable under either Title VII or the NJLAD.

### A. Gender or Race Based Harassment?

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of sex or race.'" *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "The critical issue, as Title VII's text indicates, is whether members of one sex [or race] are exposed to disadvantageous terms or conditions of employment to which members of the other sex [or race] are not exposed." *Id.* at 80, 118 S.Ct. 998 (quoting *Harris,* 510 U.S. at 25, 114 S.Ct. 367 (Ginsburg, J. concurring)).

■ Sexual harassment, for instance, can take on different forms, both overtly sexual and facially neutral. *See Ogden v. Keystone Residence,* 226 F.Supp.2d 588, 598 (M.D.Pa.2002). Offensive conduct need not necessarily include obvious sexual overtones in order to constitute unlawful harassment or discrimination. *Andrews,* 895 F.2d at 1485; rather, what "is required is a showing that [Plaintiff's gender was] a substantial factor in the harassment, and that if the plaintiff had been [male] she would not have been treated in the same manner." *Aman,* 85 F.3d at 1083; *see also Cardenas,* 269 F.3d at 261; *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 148 (3d Cir.1999). "The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course." *Andrews,* 895 F.2d at 1482 n. 3. However, "a more fact intensive analysis will be necessary where the actions are not sexual by their very nature." *Id.*

■ These same basic principles apply to allegations of racial harassment—that is, in order to constitute racial harassment, the subject comments or behavior need not be overtly racial in nature. *Aman,* 85 F.3d at 1083 (observing that "there are no talismanic expressions which must be invoked as a condition-precedent to the application of laws designed to protect against [racial] discrimination" and harassment). As the Third Circuit has recently observed, "the advent of more sophisticated and subtle forms of discrimination requires that [courts] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Cardenas,* 269 F.3d at 262.[8]

pervasive" test "conforms to the standard for establishing workplace racial or gender harassment under Title VII law").

**8.** As with Title VII, the NJLAD requires that an alleged victim of sexual or racial harassment first prove, as a threshold matter, that the conduct about which she complains occurred because of her race or gender. *See Lehmann,* 132 N.J. at 604, 626 A.2d 445. In the sexual harassment context, this element will be "automatically" satisfied in cases where the alleged harassing conduct is overtly sexual in nature, such as when a plaintiff alleges that she has been subjected to touching or comments with clearly detectible sexual overtones. *Id.* at 605, 626 A.2d 445. When the conduct alleged is facially neutral with regard to the victim's sex, she will be

## B. Severe or Pervasive Harassment?

■ In order to fall within the purview of Title VII, the sexual or racial harassment about which a plaintiff complains must be "severe or pervasive" enough to create both "an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive," and an environment which she subjectively perceives as hostile or abusive. *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367; *see also Weston*, 251 F.3d at 426 ("the harassment must be so *severe or pervasive* that it alters the conditions of the victim's employment and creates an abusive environment") (citing *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399). Both the Supreme Court and the Third Circuit have held that " 'simple teasing, offhand comments, and [non-serious] isolated incidents' do not 'amount to discriminatory changes in the terms and conditions of employment' " and are therefore insufficient to raise a genuine issue of material fact with respect to this particular element of an alleged sexual or racial harassment victim's prima facie case. *Abramson*, 260 F.3d at 280 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Courts evaluating allegations of racial or gender-based hostility are therefore encouraged to "filter out" complaints based on nothing more than the "the ordinary tribulations of the workplace, such as the sporadic use of gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 (citing *Oncale*, 523 U.S. at 80, 118 S.Ct. 998). Such screening is necessary in order "to ensure that Title VII does not become trivialized as a 'general civility code' " for the workplace. *Mobley v. City of Atlantic City Police Dept.*, 2000 WL 363692 (D.N.J. March 30, 2000) (Simandle, J.) (quoting *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275).[9]

■ In determining whether plaintiff has adduced evidence sufficient to establish an objectively hostile or abusive work environment, the court must examine the "totality of the circumstances," including

required "to make a prima facie showing that the harassment occurred because of her sex." *Id.* This can be accomplished by showing that "such harassment was accompanied by harassment that was obviously sexbased," or, alternatively, by putting forth evidence capable of supporting an inference that "only women suffered such non-facially sex-based harassment." *Id.* at 605, 626 A.2d 445. These same basic principles apply to allegations of race-based hostility or harassment. *See Watkins*, 224 F.Supp.2d at 865 (analyzing allegations of racial harassment under the NJLAD).

9. As the Court has previously noted, in order to make out an actionable hostile work environment claim under the NJLAD, a plaintiff must establish not only that the conduct she complains of occurred because of her gender or race, she must also prove that a reasonable female or African American employee would have considered such conduct sufficiently "severe or pervasive" to alter the conditions of employment and create an intimidating, hostile, or offensive work environment. *Leh-*

*mann*, 132 N.J. at 603, 626 A.2d 445. This "severe or pervasive" requirement "conforms to the standard for establishing workplace race or gender harassment under federal Title VII law," *Taylor*, 152 N.J. at 498, 706 A.2d 685, and is similarly intended to ensure that state anti-discrimination statutes do not become merely a mechanism for enforcing a "general civility code" for workplace conduct. *See Shepherd v. Hunterdon Dev. Ctr.*, 336 N.J.Super. 395, 416, 765 A.2d 217 (App.Div. 2001); *Heitzman v. Monmouth County*, 321 N.J.Super. 133, 147, 728 A.2d 297 (App.Div. 1999) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions' of employment"); *see also Lynch v. New Deal Delivery Serv., Inc.*, 974 F.Supp. 441, 452 (D.N.J. 1997) (Walls, J.) (observing that while the NJLAD establishes an employee's right to a workplace free of "severe or pervasive" gender-based hostility, it does not entitle her to "a perfect workplace, free of annoyances and colleagues she finds disagreeable.").

"the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Abramson*, 260 F.3d at 280 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367) (internal quotations omitted).[10] Consistent with the standard of review on a motion for summary judgment, the Court must evaluate the evidence relating to these factors while drawing all reasonable inferences in favor of the Plaintiff, and must deny summary judgment unless it concludes that such evidence is insufficient, as a matter of law, to permit a reasonable factfinder to conclude that Plaintiff was subjected to an objectively hostile and abusive working environment.

## IV. PLAINTIFF'S SEXUAL HARASS-MENT CLAIMS

### A. Gender–Based Harassment?

█ Defendants contend that Plaintiff is unable to "attribute any ... of Defendant Martello's comments or actions to her gender."[11] The Court disagrees. Plaintiff has offered evidence that Martello made several vulgar and offensive comments and jokes to her and her female coworkers, most, if not all, of which contained obvious or readily discernible sexual overtones and innuendo. As the Third Circuit has ob-served, such "sexually derogatory language" should generally be recognized as gender-based harassment "as a matter of course," particularly where, as here, there is little, if any, evidence in the record that Martello made such statements in the presence of any of the Unit's male employees. *Andrews*, 895 F.2d at 1482 n. 3; *see, e.g., Adan v. Solo Cup, Inc.*, 2002 WL 448996 at *5 (N.D.Ill. March 21, 2002) (concluding that a reasonable factfinder could infer that the alleged harasser's conduct was motivated by Plaintiff's gender where the summary judgment record did not contain any evidence that the "males in the workplace were subjected to the same type of conduct directed toward the [plaintiff]").

The record also contains evidence concerning several incidents in which Martello exhibited aggressive and intimidating behavior toward Plaintiff. One incident occurred during a meeting with other members of the Meadowview's supervisory staff at which Plaintiff attempted to address her concerns about what she perceived as Martello's "continuing harassment."

According to Plaintiff, at one point during that meeting, Martello stood up, leaned over top of her, stuck his finger in her face, and began denouncing her as a "liar" and a "zero" while openly taunting her about the fact that her prior com-

**10.** The New Jersey courts have identified a somewhat more extensive list of factors which may be relevant in determining whether a plaintiff has satisfied the objective "severe or pervasive" standard. These factors include: the nature of the alleged harasser's remarks or gestures; the frequency of the offensive encounters; the severity of the offensive encounters; whether the alleged harasser's actions or comments were physically threatening or intimidating; whether the alleged harasser was a co-worker or supervisor; whether others joined in perpetrating the harassment; whether the harassment was directed at more than one individual; whether the offensive encounters unreasonably inter-fered with plaintiff's work performance; and whether the offensive encounters had an effect on the plaintiff's psychological well-being. *See Baliko v. International Union of Operating Engineers, Local 825*, 322 N.J.Super. 261, 276, 730 A.2d 895 (App.Div.1999).

**11.** While Defendants question whether Plaintiff has produced sufficient evidence to establish that the conduct at issue was motivated by her gender, Defendants' brief does not offer any specific argument on this point and contains few, if any, references to the evidence in the record presently before the Court.

plaints about his behavior toward the Unit's female employees had not resulted in any disciplinary action against him. The Court is satisfied that a reasonable factfinder could conclude, under such circumstances, that Plaintiff's gender was a "substantial factor" motivating Martello's actions, particularly in light of his explicit reference to Plaintiff's previous complaints about the way in which he behaved around the Unit's female employees.

Plaintiff also gives an account of two other incidents which occurred shortly after Martello's outburst at the April 1st meeting and his remarks about her unsuccessful sexual harassment complaints. In one incident, Martello allegedly pinned Plaintiff between himself and one of the kitchen's steamtables as she and several other female employees were preparing food trays for the facility's patients. In a second incident, which occurred later that same day, near the end of Plaintiff's shift, Martello confronted Plaintiff near the rear entrance to the kitchen and, after positioning himself between Plaintiff and the exit, stood "within inches" of her face, silently staring at her. Here again, the Court is satisfied that a jury could conclude that Martello's actions, occurring as they did shortly after he openly taunted Plaintiff about her prior allegations of sexual harassment, were related to Plaintiff's gender.

The Court therefore concludes that the evidence in the record is sufficient to establish a *prima facie* showing that Martello's vulgar remarks and his allegedly aggressive and intimidating conduct constituted harassment based on Plaintiff's gender.

**B. Severe or Pervasive Sexual Harassment?**

 The record in instant case, when viewed in the light most favorable to the Plaintiff, contains evidence of gender-based harassment which "could be said to go beyond the 'simple teasing, offhand comments, and [non-serious] isolated incidents,' which the Supreme Court has cautioned would 'not amount to discriminatory changes. in the terms and conditions of employment.'" *Abramson*, 260 F.3d at 280 (quoting *Faragher*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). As previously noted, there is evidence that Martello, Plaintiff's immediate supervisor, made several sexually offensive remarks and jokes to her and several of her female co-workers. Plaintiff's testimony also suggests that she was aware that several other female employees had allegedly been subjected to similar sexually offensive comments. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir.1997) ("[T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment"); *see also Velez v. QVC*, 227 F.Supp.2d 384, 411 (E.D.Pa.2002) (observing that an employee's awareness of incidents in which other co-workers were subjected to harassment or discrimination may be relevant in establishing a generally hostile work environment).

Significantly, however, Martello's allegedly harassing conduct was not limited to a few "offhand comments" or the occasional "gender-related joke." Martello also allegedly engaged in several acts of physical aggression and intimidation in response to Plaintiff's complaints about his behavior toward her and other female employees.[12]

---

**12.** "[O]ffensive conduct is not necessarily required to include sexual overtones in every instance ... to detrimentally affect a female employee." *Andrews*, 895 F.2d at 1485. Thus, a court "may not properly discount that part of the total scenario that does not include an explicit sexual component." *Harley v. McCoach*, 928 F.Supp. 533, 540 (E.D.Pa. 1996); *see also Roberts v.University of Pennsylvania*, 2001 WL 1580304 at *6 n. 9 (E.D.Pa. Dec.11, 2001).

Furthermore, as the New Jersey Supreme Court has observed, a jury could reasonably conclude that the impact and severity of Martello's conduct was aggravated by the fact that he was a member of the management staff with direct responsibility for supervising Plaintiff's work performance. *See Taylor,* 152 N.J. at 503, 706 A.2d 685 (observing that the severity of the alleged harasser's racist remark "was exacerbated by the fact that it was uttered by a supervisor"); *see also Flizack v. Good News Home for Women, Inc.,* 346 N.J.Super. 150, 160, 787 A.2d 228 (App.Div.2001) (observing that the alleged harasser's supervisory status greatly magnified the gravity her conduct); *Leonard v. Metropolitan Life Ins. Co.,* 318 N.J.Super. 337, 345, 723 A.2d 1007 (App.Div.1999) ("the severity of the remarks was underscored by the fact that they were uttered by plaintiff's supervisor"). After all, a "supervisor has a unique role in shaping the work environment," a role which brings with it a heightened obligation to "prevent, avoid, and rectify invidious harassment in the workplace." *Taylor,* 152 N.J. at 503, 706 A.2d 685. Accordingly, the Court is satisfied that the evidence regarding Martello's conduct toward Plaintiff and her female coworkers raises a genuine issue of material fact with respect · to whether Plaintiff was subjected to an objectively hostile work environment-that is, one which a reasonable woman in Plaintiff's position would find hostile or abusive. *See, e.g., Ferraro v. Bell Atlantic Company, Inc.,* 2 F.Supp.2d 577, 588 (D.N.J.1998) (Irenas, J.) (concluding that evidence that female employee's male co-workers engaged in "name ·calling" and displayed a "derogatory attitude toward women," together with testimony regarding one employee's "violent outburst" toward the plaintiff, raised a genuine issue of fact regarding whether "a reasonable woman [would] feel [that] the conditions of her

employment had been altered and the environment had become hostile.").

## V. PLAINTIFF'S RACIAL HARASS-MENT CLAIMS

### A. Race–Based Harassment?

The evidence Plaintiff marshals in support of her allegations of racial harassment can be divided into roughly five categories: (1) testimony regarding remarks allegedly made by each of the individually named defendants in this action; (2) Plaintiff's testimony regarding three incidents in which Defendant Martello allegedly exhibited aggressive and intimidating conduct toward her; (3) testimony concerning allegations that Defendant Oaks gave preferential treatment to one of Plaintiff's white co-workers; (4) Plaintiff's testimony regarding her heated arguments with Defendant Oaks; and, finally, (5) testimony concerning an incident in which Defendants Oaks, Ross, and Bennet allegedly "manipulated" Plaintiff's 1999/2000 annual performance evaluation. The Court now turns to examine the evidence in the record relating to each of these categories.

#### i. *Racially Offensive Comments?*

■ As evidence of the level of racial hostility in the Meadowview kitchen, Plaintiff points to testimony in the record concerning various remarks made by each of the individually named defendants in this action, remarks which she contends are racially derogatory and indicative of the climate of racial hostility which allegedly permeated her work environment. This evidence includes testimony that:

- Defendant Martello repeatedly called Plaintiff a "nigger" in conversations with Dennis Maurer, an assistant FSM in the Meadowview's kitchen Dietary Unit (Maurer Dep. at 125:7–130:25);

- Defendant Jeri Oaks often used the term "you people" when addressing the Unit's predominantly African American staff and occasionally compared them to "children" or "babies" (Hargrave Dep. at 371:18–21; Swaggerty Dep. at 20:3–21:18; 50:24–54:6; Forbey Dep. at 16:8–22:22; Purelli Dep. at 17:20–20:13; 52:18–54:6); she directed such statements primarily, if not exclusively, at the Unit's African American employees (Swaggerty Dep. at 20:3–21:18; Forbey at 21:2–7); and she continued to use the term "you people" even after being counseled that several of the Unit's African American employees considered her use of that term to be racially offensive and derogatory (Hopkins Dep. at 20:9–21:22; 53:11–14; 56:21–58:9).

- Oaks once told assistant FSM Maurer that the reason African American employee "fight to keep their jobs" is because most are "real poor" and "on welfare" (Maurer Dep. at 38:3–12);

- Oaks once told another white employee that she did not need to worry about Lisa Holland, one of Plaintiff's black co-workers, because she is "one of us," a remark which Holland, who was present at the time, understood as a reference to her relatively light complexion (Holland Dep. at 22:2–18);

- Defendant Joyce Ross, deputy director of the Atlantic County Department of Human Services, once told assistant FSM Maurer that the reason black employees tended to be particularly "aggressive" about keeping their jobs was because most were "not married" and were desperate to "stay off welfare" (Maurer Dep. at 179:15–180:10);

- Defendant Ross once told Maurer that black employees often use allegations of discrimination as their "hold card" to avoid being disciplined for misconduct (Maurer Dep. at 45:15–17);

- Ross warned Maurer, on "several" occasions, to "be very careful with the black people" and to avoid getting "on the elevator with them." (Maurer Dep. at 48:10–22);

- Ross once told Maurer that he "should hire just white people" and that he should "stay away from hiring black people" regardless of an applicant's qualifications (Maurer Dep. at 182:1–183:15);

- Ross encouraged Maurer to give "poor evaluations" to Plaintiff and three other African American employees whom she considered "troublemakers" in order to "help with the disciplin[ary] process" and make it easier to "get rid of" them (Maurer Dep. at 200:10–201:19);

- Defendant Wilton Bennet, the facility's chief administrator, once referred to the Dietary Unit's predominantly African American staff as a "bunch of gangbangers." during a meeting with the Meadowview's supervisors and union representatives in 1998 (Hopkins Dep. at 32:10–33:15).

The Court is satisfied, in light of the nature and content of these statements, as well as the circumstances in which they were made, that a rationale factfinder, viewing this testimony in the light most favorable to the Plaintiff and drawing all reasonable inferences in her favor, could conclude that such comments exhibited racial prejudice or hostility.

The Court reaches a different conclusion, however, with respect to testimony concerning other comments which Defendant Oaks allegedly made to some of Plaintiff's African–American co-workers. This evidence includes testimony that Oaks once told Lisa Holland, one of Plaintiff's black co-workers, that she lacked "common sense" (Holland Dep. at 21:10–23:1); that in 1997, when she was first hired, Oaks

told Diane Forbey, another one of Plaintiff's black coworkers, that she was "embarrassed to know someone like her." (Forbey Dep. at 36:6–37:3; Swaggerty Dep. at 19:17–20); and, finally, testimony that Oaks once told Elise Spiller, another black kitchen worker, that she "needed to go back to school." (Swaggerty at 19:20–23; 22:20–22). The testimony concerning these remarks, which, standing alone, are neutral with regard to race, is too vague and conclusory to support an inference that Oak's comments were race-based; it indicates only that such statements were made and that those African American employees at whom they were directed considered them to be racially insensitive or derogatory. Plaintiff has not pointed to any testimony or other evidence regarding the specific context or circumstances in which these remarks were made. Accordingly, while such statements might be considered rude or obnoxious, Plaintiff has failed to produce evidence which would permit a jury to conclude that these remarks were "substantially related" to the race of the employees at whom they were directed. *Cf. Andrews*, 895 F.2d at 1485 (observing that "a more fact intensive analysis will be necessary" where the alleged harassment does not contain overt or readily detectible sexual overtones); *see also Adeniji v. Admin. for Child. Servs.*, 43 F.Supp.2d 407, 423 (S.D.N.Y.1999) ("It is well settled that . . . speculations, generalities, and gut feelings, however, genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn"). The Court therefore agrees with Defendants that Plaintiff has failed to make a prima facie showing that these comments constituted racial harassment.

ii. *Defendant Martello's Allegedly Aggressive and Intimidating Conduct*

■ Plaintiff contends that the aggressive and threatening conduct which Defendant Martello allegedly exhibited during the first week of April 1997, reflected hostility based not only on her gender but also on her race. The racially hostile character of Martello's conduct, Plaintiff argues, can be inferred from testimony regarding statements he allegedly made to Dennis Maurer, one of the Unit's assistant food service managers, both before and after these incidents occurred. Maurer has testified that he had several conversations with Martello in the days and months surrounding these three incidents in which Martello repeatedly called Plaintiff a "blankety-blank nigger" and vowed to "get even with her" for bringing "sexual harassment charges against him." (Maurer Dep. at 124:16–125:25; 130:14–25; 28:1–29:18). While this testimony may not conclusively demonstrate the underlying motivation for Martello's threatening and intimidating behavior, it is prima facie evidence that his conduct was based, at least in part, on Plaintiff's race. *Cf. Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir.1999) (concluding that defendant's facially neutral actions constituted sexual harassment where there was evidence that they were motivated by gender-based animus); *see also Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir.1996) (observing that "a plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled . . . because of crabbed notion of relevance or excessive mistrust of juries") (citation and internal quotations marks omitted).

iii. *Preferential Treatment Toward White Employees?*

Plaintiff alleges that Defendant Oaks often gave preferential treatment to the Dietary Unit's white employees. There is, however, little, if any, evidence in the record to support this contention. Indeed, the testimony which Plaintiff cites to support this allegation focuses exclusively on

Oak's treatment of a single white employee named Frances Pies. She has not alleged, much less produced any evidence, that any of the Unit's other white employees enjoyed similar preferential treatment. Moreover, while Plaintiff alleges that Oaks frequently allowed Piehs "to get away with things that no other employee was allowed to get away with," her deposition testimony fails to identify even one incident in which either she or any of the Dietary Unit's other African American employees were disciplined by Oaks for engaging in behavior similar to that displayed by Piehs or the Unit's other caucasian employees. (Hargrave Dep. at 236:25–239:17). In short, while some of the testimony in the record suggests that several of the Unit's employees resented Pieh's close relationship with Defendant Oaks, Plaintiff has not produced evidence from which a reasonable factfinder could infer that Oaks allegedly lax treatment of Piehs reflected preferential treatment based on race and not some other perfectly lawful criteria.

#### iv. *Verbal Altercations Between Plaintiff and Defendant Oaks*

Plaintiff argues that her heated verbal exchanges with Defendant Oaks in October 1999 and February 2000 are further evidence of the race-based harassment and hostility which she was forced to endure. However, there is simply nothing about the circumstances surrounding these two incidents which would support an inference that Oak's conduct or comments reflected a racial animus or hostility toward Plaintiff. (Hargrave Dep. at 90:11–96; 226:7–228:1; Oaks Dep. at 24:8–25:21). *See Adeniji v. Admin. for Child. Serv.*, 43 F.Supp.2d at 423 (observing that conclusory allegations of racial harassment which are unsupported by specific facts in the record cannot support an inference of discrimination). Indeed, Plaintiff acknowledges that it was she, not Defendant Oaks, who instigated both of these incidents.

(Hargrave Dep. at 95:1–18; 228:17–229:25). *See Ogden v. Keystone Residence*, 226 F.Supp.2d 588, 598 (M.D.Pa.2002) (observing that offensive conduct which is not "unwelcome to the plaintiff" cannot support a hostile work environment claim). Moreover, it is clear from her deposition testimony that Plaintiff faults Oaks for engaging conduct she believed to be rude, disrespectful, and unprofessional, not for exhibiting behavior which reflected some form of racial hostility or animus. (*Id.* at 229:16–25).

#### v. *The Alleged "Manipulation" of Plaintiff's Annual Performance Evaluation*

When plaintiff received her annual performance evaluation for the 1999/2000 employment period, she refused to sign it on the grounds that it contained inaccurate information about her disciplinary history. Defendant Oaks, the supervisor who had prepared the evaluation, then reported Plaintiff's concerns to Defendant Bennet, the facility's chief administrator, and the two convened a meeting with Defendant Ross, to discuss Plaintiff's evaluation. At this meeting, Bennet expressed his disagreement with Oak's assessment of Plaintiff's "dependability," and, after some discussion, instructed her to downgrade Plaintiff's "dependability" rating from "satisfactory" to "marginal" so that it would reflect the fact that Plaintiff had completely exhausted all of her allotted "sick days." Defendant Ross also instructed Oaks to make certain changes to Plaintiff's evaluation. Specifically, she told Oaks that her comments, which offered a very positive assessment of Plaintiff's work performance, should be left out of the second, revised version of Plaintiff's evaluation. She did not, however, offer any explanation as to why these comments should be omitted.

According to the testimony of Dennis Maurer, one of the facility's assistant food service managers, Ross frequently expressed racially derogatory sentiments when speaking about the Unit's African American employees. (Maurer Dep. at 45:15–27; 48:10–22; 179:15–180:10; 182:1–183:15). Maurer has also testified that Ross openly encouraged him to give Plaintiff, and three of the Unit's other female employees (all of whom were black) "poor evaluations" in order to facilitate her efforts to "get rid of them." (*Id.* at 200:10–201:19). The Court is satisfied that this evidence suffices to raise a genuine issue of material fact as to whether Ross's instructions to Oaks were racially motivated. *See Aman*, 85 F.3d at 1082 (observing that "a plaintiff's ability to prove [racial harassment] or discrimination indirectly, circumstantially, must not be crippled ... because of a crabbed notion of relevance or excessive mistrust of juries").

The Court reaches a different conclusion, however, with respect to Defendant Bennet. In arguing that Defendant Bennet's actions were racially motivated, Plaintiff relies exclusively on testimony regarding a meeting which occurred over a year and a half earlier in which Bennet allegedly referred to the Unit's predominantly African–American staff as a bunch of "gangbangers." The Court is not persuaded that this single, isolated comment provides sufficient circumstantial evidence to support an inference that his decision to downgrade Plaintiff's dependability rating was motivated by Plaintiff's race. Moreover, Plaintiff has not offered any evidence regarding her attendance record for the 1999/2000 employment period which would tend to cast doubt on Bennet's stated reason for adjusting her "dependability" rating. Accordingly, the Court agrees with Defendants that Plaintiff has failed to provide prima facie evidence that Bennet's conduct constituted racial harassment.

### B. "Severe or Pervasive" Racial Harassment?

The Court observes, at the outset, that much of the testimony which Plaintiff has referenced in her opposition to Defendants' summary judgment motion is irrelevant to her own individual claim that she was subjected to a work environment hostile to African–American employees. Plaintiff, for instance, relies, in part, on an excerpt from the deposition testimony of Lisa Holland, one of her African–American co-workers, in which Holland relates an incident in which Defendant Oaks is alleged to have made what could reasonably be interpreted as an inappropriate remark about her relatively light-skinned complexion. (Holland Dep. at 22:2–18). She also cites testimony in which other African American employees claim that Oaks occasionally belittled them by comparing them to "children" or "babies." (Swaggerty Dep. at 20:3–21:18; Forbey Dep. at 16:8–22:22).

The Court recognizes that evidence of racial discrimination or harassment which has been directed at a plaintiff's co-workers may, under certain circumstances, be relevant in establishing a hostile work environment claim. *See Morales–Evans v. Administrative Office of the Courts*, 102 F.Supp.2d 577, 589 (D.N.J.2000) (Greenaway, J.). Thus, for example, evidence that Plaintiff witnessed other black employees being harassed by co-workers or supervisory personnel could potentially contribute to the perception that her work environment has become hostile to African–Americans. *Cf. Hurley v. Atlantic City Police Department*, 174 F.3d 95, 110 (3d Cir. 1999) (observing that a female employees work environment may be "altered as a result of witnessing a defendant's hostility towards other women at the workplace") (citing *Lehmann*, 132 N.J. at

611, 626 A.2d 445) (noting that a plaintiff's perception that her work environment has become sexually abusive or hostile may "be reinforced if she witnesses the harassment of other female workers"). Similarly, evidence that Plaintiff "learn[ed] second-hand of a racially derogatory comment or joke by a fellow employee or supervisor" may be relevant in assessing the impact of alleged racial harassment or hostility on her work environment. *Schwapp*, 118 F.3d at 111; *see also Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir.1999) (noting that court evaluating a hostile work environment claim may "credit[ ] evidence of racial harassment directed at someone other than the plaintiff" where there is evidence that "the plaintiff knew a derogatory term [had] been used"); *Velez v. QVC*, 227 F.Supp.2d 384, 411 (E.D.Pa.2002) (observing that a plaintiff "need not have witnessed the incidents involving other employees. Hearing about them, even second hand, is sufficient to make a plaintiff aware of the nature of the environment."). However, while a plaintiff may sometimes "rely upon incidents involving other employees to show the presence of a hostile work environment," this "does not mean that plaintiff can claim to have been victimized by every [act of racial discrimination or harassment] ever perpetrated" in the workplace. *Velez*, 227 F.Supp.2d at 410. Rather, there must at least be some evidence that plaintiff was subjectively aware of the discrimination or harassment allegedly directed at her fellow employees at some point during the course of her employment. *See Wanchik v.Great Lakes Health Plan, Inc.*, 6 Fed.Appx. 252 (6th Cir.2001); *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 249 n. 4 (6th Cir.1998) (rejecting as irrelevant testimony concerning harassment about which plaintiff knew nothing during her employment); *see also An-drews*, 895 F.2d at 1483 (observing that the subjective component of a hostile work environment claim—that is, the requirement that the plaintiff demonstrate that she was personally "detrimentally affected" by the conduct complained of— is "crucial because it demonstrates that the alleged conduct injured this particular plaintiff giving her a claim for judicial relief"); *Velez*, 227 F.Supp.2d at 410 (citing *Andrews* for the proposition that "the plaintiff must show subjective awareness of the discrimination directed at others" because "[t]he court must be able to assess whether the discrimination, in fact, detrimentally affected the plaintiff"); *Wilson v. Dana Corporation*, 210 F.Supp.2d 867, 878 (W.D.Ky.2002) ("the fact that the challenged conduct must be examined on both an objective and a subjective basis ... requires that the plaintiff must at least have been aware of harassment [involving other employees] while employed by the defendant").

■ In the instant case, there is no indication in Plaintiff's deposition testimony or elsewhere in the record that Plaintiff was aware, whether directly or indirectly, that Oak's sometimes made remarks likening the kitchen's staff to "children." Plaintiff's deposition also makes no mention of the remark Oak's allegedly made about Holland's complexion and nothing in Holland's deposition indicates whether she ever told Plaintiff or any of her other co-workers about this remark. The testimony concerning these statements therefore cannot support Plaintiff's allegation that she was subjected to a racially hostile work environment. *See Velez*, 227 F.Supp.2d at 414 n. 28 (concluding that incidents of alleged gender hostility which plaintiff had not personally experienced or witnessed could not support plaintiff's hostile work environment claim absent "evi-

dence that [she] learned of [those] incidents during her employment").

Plaintiff also cites to testimony concerning various racially derogatory statements which Defendants Martello, Oaks, and Ross allegedly made during private conversations and with Dennis Maurer, one of the facility's assistant food service managers, as well as a remark allegedly made by Defendant Bennet during a meeting with a group of union representatives and supervisory personnel. Here again, however, there is no indication in the record that Plaintiff was ever actually aware of these statements during the time she was employed at the Meadowview. Accordingly, these statements also fail to support Plaintiff's hostile work environment claim.

Plaintiff has, however, produced other evidence which could properly support her claim that she was subjected to a racially hostile work environment. She has, for instance, produced testimony that Defendant Oaks frequently referred to her and other African American employees as "you people" and that she continued to do so even after she was counseled regarding several complaints from African–American employees who considered her comments racially offensive and derogatory. Plaintiff has also produced testimony regarding several incidents in April 1997 in which Defendant Martello, who had, in conversations with assistant FSM Maurer, repeatedly referred to Plaintiff in blatantly racist terms and vowed to "get even with her" for her complaints about his workplace behavior, screamed at Plaintiff and exhibited physically aggressive and intimidating conduct toward her. This evidence includes: (1) testimony regarding a meeting on April 1, 1997, in which Martello screamed at Plaintiff, called her a "liar" and a "zero", and came across his desk while gesturing as if he was going to strike her; (2) testimony concerning an incident on April 8, 1997, in which Defendant Mar-

tello allegedly pinned Plaintiff up against a serving table and refused to move; and, finally, (3) testimony regarding a second incident on April 8, 1997, in which Martello allegedly confronted Plaintiff at the back entrance to the kitchen facility and stood "within inches" of her face as she was attempting to exit the kitchen. Finally, Plaintiff has offered proof that Defendant Ross attempted to "manipulate" her 1999/2000 annual performance evaluation. While these incidents of race-based harassment may not have been particularly frequent or "pervasive," the Court cannot conclude, as a matter of law, that no reasonable African American employee would consider the comments and conduct described by this testimony "severe" enough to create an objectively hostile or abusive working environment. *See West v. Philadelphia Electric Co.,* 45 F.3d 744, 757 (3d Cir.1995) (noting that "[a]s the Supreme Court made clear in *Harris,* frequency is a factor to be considered, but it is to be considered in context, including the severity of the incidents ... A Title VII plaintiff does not have to prove racial harassment or the existence of a hostile working environment by alleging some 'magic' threshold number of incidents"). Martello's conduct, in particular, "could be said to go beyond the 'simple teasing, offhand comments, and [non-serious] isolated incidents,' which the Supreme Court has cautioned would 'not amount to discriminatory changes in the terms and conditions of employment.'" *Abramson,* 260 F.3d at 280 (quoting *Faragher,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)); *see, e.g., Bishop v. National Railroad Passenger Corp.,* 66 F.Supp.2d 650, 654 (E.D.Pa. 1999) (noting that evidence of physical aggression or intimidation is an important factor in determining whether conduct was sufficiently severe to give rise to an objectively hostile work environment); *see also Roberts v. University of Pennsylvania,*

2001 WL 1580304 at * 6 (E.D.Pa. December 11, 2001) (observing that "even mere threats of physical force" can enhance the objective severity of the alleged harasser's conduct). The Court will, therefore, deny that part of the motion submitted by Defendants Martello, Bennet, and Atlantic County which seeks summary judgment with respect to Plaintiff's race-based hostile work environment claims.

## VI. PLAINTIFF'S RETALIATION CLAIMS

Plaintiff alleges that she was subjected to two separate "rounds" of reprisals as a result of her complaints about the alleged racial and sexual harassment in the Meadowview's Dietary Unit. (Pl.'s Opp. Br. at 7). The first "round" allegedly consisted of the five-day suspension she received shortly after her meeting with Defendant Martello on April 1, 1997. (*Id.*). The "second round" of alleged adverse employment actions, Plaintiff explains, "occurred in 1999 and 2000, shortly after the EEOC issued its finding of retaliation for the April 1, 1997 incident" and "culminated in [an] unfavorable job evaluation and a notice of proposed termination." (*Id.*). For purposes of this motion, Defendants contend that they are entitled to summary judgment on plaintiff's unlawful retaliation claims because the record fails to contain evidence sufficient to establish a prima

facie case of retaliation under either Title VII or the NJLAD. For the reasons set forth below, Defendants' motion will be granted in part and denied in part.

### A. Plaintiff's Suspension

 To make out a prima facie claim for unlawful retaliation under Title VII and the NJLAD, a plaintiff must produce evidence that: (1) she engaged in activity protected by Title VII and the NJLAD; (2) her employer took an adverse employment action against her either after or contemporaneous with her protected activity; and (3) a causal connection exists between that adverse employment action and her protected activity. *See Abramson,* 260 F.3d at 286; *Craig v. Suburban Cablevision, Inc.,* 140 N.J. 623, 660 A.2d 505, 508 (1995).[13] Here, there can be little dispute that the five-day suspension Plaintiff received on April 18, 1997, constituted the type of tangible, "adverse employment action" contemplated by Title VII and the NJLAD. *See Gharzouzi v. Northwestern Human Services of Pennsylvania,* 225 F.Supp.2d 514, 541 (E.D.Pa.2002) (noting that plaintiff's suspension constituted an adverse employment action under Title VII) (citing *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997)); *Williams v. Penn. State Police Bureau of Liquor Control Enforcement,* 108 F.Supp.2d 460, 466 (E.D.Pa.2000) (same);

---

**13.** "The actual language used by the New Jersey courts, with respect to the first prong [of an NJLAD retaliation claim], is that an employee must show that he or she engaged in protected activity known *by the employer.*" *Abramson,* 260 F.3d at 286 n. 17 (citing *Craig,* 140 N.J. at 629, 660 A.2d 505) (emphasis in original). In articulating the essential elements of a Title VII retaliation claim, the Third Circuit does not explicitly require proof that an employer was aware of plaintiff's protected activity. The Court has observed, however, that a plaintiff cannot make out a prima facie showing of causation without some evidence that the decision-makers responsible

for the alleged adverse employment action were aware of the plaintiff's protected activity. *See Jones,* 198 F.3d at 415; *see also Anderson v. Deluxe Homes of PA, Inc.,* 131 F.Supp.2d 637, 656 (noting that, in order to demonstrate a causal link, "the person who performed the adverse employment action against the plaintiff must have had knowledge of the plaintiff's protected activity"); *Bedford v. Southeastern Pennsylvania Transportation Authority,* 867 F.Supp. 288, 293 (E.D.Pa. 1994) (same). Thus, as a practical matter, the elements of a prima facie case of unlawful retaliation are essentially the same under Title VII and the NJLAD.

*see also Mancini v. Township of Teaneck*, 349 N.J.Super. 527, 564, 794 A.2d 185 (App.Div.2002) (observing that trial court "properly looked to federal law dealing with Title VII and Civil Rights legislation to determine what constituted an adverse employment action in the context of a LAD retaliation claim"). Plaintiff also clearly engaged in protected activity in early March 1996 when she made complaints about Defendant Martello's alleged sexual harassment to Atlantic County's Human Services Department and EEO office, and, again, in early October 1996, when she filed a formal charge of sexual harassment with the EEOC. *See Barber v. CSX Distribution Services*, 68 F.3d 694, 701 (3d Cir.1995) (observing that protected conduct includes both the filing formal charges of discrimination with the EEOC and "informal protests" or "complaints to management" about "discriminatory employment practices"); *see also Woods–Pirozzi v. Nabisco Foods*, 290 N.J.Super. 252, 275, 675 A.2d 684 (App.Div.1996) (concluding that plaintiff "clearly engaged in protected activity under the NJLAD when she filed a charge with the EEOC"). Thus, for purposes of this motion, the question the Court must resolve is whether the evidence in the record is sufficient to raise a genuine issue of material fact as to whether a causal link exists between Plaintiff's suspension and her previous complaints about Defendant Martello's alleged sexual harassment. The Court must deny summary judgment unless it can conclude that the record fails, as a matter of law, to supply prima facie evidence of the required causal connection.

 In determining whether a plaintiff has produced prima facie evidence of causation, the decisions of our Court of Appeals have generally focused on two indicia: timing and evidence of ongoing antagonism. *See Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir.1997); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920–21 (3d Cir.1997); *Watkins*, 224 F.Supp.2d at 871. Although the timing of an employer's adverse employment action will, by itself, rarely provide prima facie evidence that disciplinary action is attributable to retaliatory motives,[14] the temporal proximity between an employer's action and an employee's protected activity may permit an inference of causation where the relatively short interval between the two is "unusually suggestive" of retaliation. *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir.1997); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir.1997) (observing that temporal proximity alone may suffice to establish a causal connection if the timing of an employer's adverse employment action is "unusually suggestive" of retaliation); *see also Schatzman v. Martin Newark Dealership, Inc.*, 158 F.Supp.2d 392, 403 (D.Del.2001) (noting that "courts are quick to draw an inference of causation" where the alleged retaliation "occurs only a short time after the employer receives notice of an employee's protected activity"); *see, e.g., Jalil v. Avdel Corporation*, 873 F.2d 701, 708 (3d Cir.1989) (finding that record allowed for inference of causation where less than two days elapsed between the plaintiff's termination and the date his employer was put on notice of his protected activity). In cases where the timing of an employer's adverse action is, by itself, inconclusive, plaintiff may demonstrate a causal link by producing circumstantial evidence of "ongoing antagonism" or "retaliatory animus" in the intervening period between her complaints and the adverse action.

---

**14.** The converse is also true—that is, "the mere passage of time [will not be] legally conclusive proof against retaliation." *Krouse*, 126 F.3d at 503 (quoting *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir.1993)).

*See Kachmar,* 109 F.3d at 177; *Woodson,* 109 F.3d at 921.

■■■ Timing and proof of antagonism are not, however, the only methods by which a plaintiff can make out a prima facie showing of causation. *Abramson,* 260 F.3d at 289 (noting that a "broad array" of circumstantial evidence may be used to illustrate a potential causal link between a plaintiff's protected activity and an employer's adverse action); *Kachmar,* 109 F.3d at 177 (observing that the "proffered evidence, when looked at as a whole, may suffice to permit causal inference"). After all, "it is causation, not temporal proximity [or evidence of antagonism], that is an element of Plaintiff's prima facie case, and temporal proximity [or antagonism] merely provide an evidentiary basis from which an inference [of causation] can be drawn." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir.2000) (quoting *Kachmar,* 109 F.3d at 178). Thus, the Court of Appeals has not excluded the possibility that the timing of an employer's action, together with "other types of circumstantial evidence," may also suffice to support an inference of causation. *Farrell,* 206 F.3d at 280–81; *see also Kachmar,* 109 F.3d at 178 (observing that "the element of causation, which necessarily involves an inquiry into the motives of the employer, is highly context-specific"). In short, the case law has set forth few limits on the type of evidence which might suffice to establish a prima facie showing of causation. *See Farrell,* 206 F.3d at 281 ("[W]e have been willing to explore the record in search of evidence, and our caselaw has set forth no limits on what we have been willing to consider."); *see also Schatzman,* 158 F.Supp.2d at 403.

■■■ Here, the evidence in the record indicates that Plaintiff was suspended over five months after filing a charge of sexual harassment with the EEOC and more than a year after she first filed complaints about Defendant Martello's alleged harassment with the County's EEO office and Human Services Department. Thus, the timing of Plaintiff's suspension is not particularly indicative of retaliation. The Court is nevertheless satisfied that the testimony concerning the circumstances surrounding the County's decision to discipline Plaintiff, together with evidence of Defendant Martello's antagonistic behavior and expressions of "retaliatory animus," is sufficient, for purposes of Plaintiff's prima facie case, to raise a genuine issue as to whether a causal connection exists between her protected activity and her suspension. *Cf. Farrell,* 206 F.3d at 279 n. 5 (observing that the probative value of circumstantial evidence of causation, such as evidence of temporal proximity, may vary depending on the stage of the burden-shifting analysis); *see also Gharzouzi,* 225 F.Supp.2d at 542 (same).

Martello was briefly suspended during the investigation into the allegations of sexual harassment which Plaintiff first raised in a memo to Atlantic County's Human Services Department on March 1, 1996. However, Plaintiff has testified that, when he returned, Martello continually harassed her by, among other things, following her around the workplace, misinforming other supervisory staff about the nature of her job responsibilities, falsely accusing her of taking "unauthorized" breaks, and giving her poor ratings for her allegedly "poor attitude" toward the management staff. Indeed, according to the testimony of Dennis Maurer, one of the Unit's assistant food managers, Martello repeatedly referred to Plaintiff in blatantly racist terms and spoke openly about his desire to "get even" with her for questioning his behavior toward the Unit's female employees. When plaintiff attempted to address what she perceived as Martello's "continued harassment" at a meeting on April 1, 1997, Martello alleged-

ly erupted in a frightening display of hostility and anger, denouncing Plaintiff as a "liar" and a "zero" and openly taunted her about her prior sexual harassment allegations. In reporting the incident to Susan DeMos, the Director of Support Services at the County's Human Services Department, Martello falsely accused Plaintiff of being the initial aggressor and sought to have her disciplined for her behavior. DeMos, in turn, appears to have relied heavily, if not exclusively, on Martello's account of the incident, in reaching her decision to suspend Plaintiff. Indeed, while the there is evidence which suggests that she was aware Plaintiff had complained about Martello's conduct at the meeting, DeMos acknowledges that she did not interview Plaintiff before taking disciplinary action against her.

While there is no evidence that DeMos, the person most directly responsible for Plaintiff's suspension, was herself motivated by a desire to retaliate against Plaintiff for her past complaints of sexual harassment, a rationale factfinder, viewing the available evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, could conclude that Martello's allegedly fabricated account of Plaintiff's conduct at the April 1st meeting factored prominently in DeMos's ultimate decision to discipline her, thereby infecting the decisionmaking process with retaliatory animus. *Cf. Abramson,* 260 F.3d at 286 ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate."); *see, e.g., Abrams v. Lightolier Inc.,* 50 F.3d 1204, 1214 (3d Cir.1995) (concluding in age discrimination case that where the record suggests that plaintiff's supervisor exerted influence over the decision to terminate him, evidence of that supervisor's age-related animus is relevant in determining whether discriminatory animus motivated the decision even though plaintiff was formally terminated by company president); *see also Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 226 (5th Cir.2000) ("If employee can demonstrate that others had influence or leverage over the official decisionmaker . . . it is proper to impute their discriminatory attitudes to the formal decisionmaker."); *Roebuck v. Drexel University,* 852 F.2d 715, 727 (3d Cir.1988) ("it is plainly permissible for a jury to conclude that an evaluation at any level, if based on discrimination, influenced the decisionmaking process and thus allowed discrimination to infect the ultimate decision"); *Griffin v. Washington Convention Ctr.,* 142 F.3d 1308, 1312 (D.C.Cir.1998) ("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence."); *Kientzy v. McDonnell Douglas Corp.,* 990 F.2d 1051, 1060 (8th Cir.1993) ("A reasonable jury could have found that [the employee] used [the decisionmakers] as the conduit of his prejudice . . ."). Accordingly, because the record raises a genuine issue of material fact with regard to the extent to which Martello, who had allegedly openly declared his retaliatory intentions, influenced DeMos's ultimate decision to suspend Plaintiff, the Court is satisfied that Plaintiff has succeeded in producing prima facie evidence of a causal connection between her sexual harassment complaints and her suspension. The Court will therefore deny that part of Defendants' motion which seeks summary judgment with respect to Plaintiff's allegations that her suspension constituted unlawful retaliation for activity protected by Title VII and the NJLAD.

**B. Plaintiff's Disciplinary Notice and 1999/2000 Annual Performance Review**

Plaintiff alleges that she suffered a "second round" of reprisals in 1999 and 2000 and identifies two alleged "adverse employment actions" as evidence of Defen-

dants' retaliatory conduct. The first is a Notice of Disciplinary Action which was issued on February 23, 2000. The second is a negative evaluation she received on March 30, 2000.

■ Neither of these actions amount to the type of tangible, adverse employment action required to state an actionable claim of retaliation under Title VII and the NJLAD. In order to constitute an "adverse employment action," the retaliatory conduct alleged must be "serious and tangible" enough to alter an employee's compensation, terms, conditions, or privileges of employment, deprive her future employment opportunities, or otherwise have a "materially adverse" effect on her status as an employee. *Robinson*, 120 F.3d at 1300–01 (3d Cir.1997); *see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 749, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (defining an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, a decision causing a significant change in benefits"); *Marrero v. Camden County Board of Social Services*, 164 F.Supp.2d 455, 473 (D.N.J.2001) (Irenas, J.) ("In order to constitute 'adverse employment action for purposes of the LAD, 'retaliatory conduct' must affect adversely the terms, conditions, or privileges of the plaintiff's employment or limit, segregate, or classify the plaintiff in a way which would tend to deprive her of employment opportunities or otherwise affect her status as an employee.") (quoting *Hurley v. Atlantic City Police Department*, 1998 WL 351781 at *12 (D.N.J. May 28, 1998)).

■ The employment evaluation which Plaintiff cites as evidence of unlawful retaliation was issued shortly after she complained that her initial evaluation contained inaccurate information about her disciplinary history. While it is undisputed that this second, "corrected" evaluation downgraded Plaintiff's performance ratings and omitted her supervisor's positive comments about her work performance, Plaintiff has not offered proof that either of these evaluations had any effect, adverse or otherwise, on the terms, conditions, compensation, or benefits of her employment or prejudiced her ability to take advantage of future employment opportunities. *See Weston*, 251 F.3d at 430–31 (concluding that plaintiff's written reprimands did not constitute adverse employment actions where plaintiff's "own deposition testimony indicate[d] that he was not demoted in title, did not have his work schedule changed, was not reassigned to a different position or location ..., did not have his hours or work changed or altered in any way, and that he was not denied any pay raise or promotion as a result of [the] reprimands"); *see also Mitura v. Daulton*, 1999 WL 163629 at *4 (E.D.Pa. March 18, 1999) (concluding that plaintiff's negative performance evaluation could not be considered an adverse employment action in the absence of evidence that the evaluation had an actual adverse effect on the conditions of her employment) (citing *Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir.1996)). Nor can the Court simply assume that these evaluations had a materially adverse effect on Plaintiff's employment status or future employment prospects. *See Weston*, 251 F.3d at 431 (concluding that the district court erred when it found that plaintiff's written reprimands rose to the level of an adverse employment action "because of their 'presumed' effect on [the] compensation, terms, conditions or privileges of [plaintiff's] employment."); *see also Lamacchia v. Rumsfeld*, 2002 WL 31513390 at * 12 (E.D.Pa. October 29, 2002) (observing that the mere "fact that plaintiff received a negative performance appraisal alone is not enough to support a finding of an adverse employment action"); *Jenkins v. Philadelphia Housing*

*Authority,* 2001 WL 1298988 at *5 (E.D.Pa. Oct.24, 2001) (observing that a written reprimand "does not meet the requirement for an adverse employment action without evidence of how such a reprimand effected a material change in the conditions of [plaintiff's] employment. A presumed effect is not enough."); *Elwell v. PP & L,* 2001 WL 1529063 at * 9 (E.D.Pa. Nov.28, 2001) ("the presumed or speculative effect of an evaluation, without a showing of actual harm, is insufficient to demonstrate an adverse employment action."). Indeed, uncontradicted evidence in the record indicates that, within weeks after being issued, both of these evaluations were declared void, removed from Plaintiff's personnel file, and officially replaced by a final, revised evaluation that addressed all of her stated objections. *See Weston,* 251 F.3d at 431 (concluding that written reprimands were not adverse employment actions because they were of a "temporary nature," were "not permanently affixed to [plaintiff's] employment file," and did not change or alter plaintiff's employment status). The Court therefore concludes that Plaintiff has failed to raise a genuine issue of material fact as to whether these performance evaluations constituted "adverse employment actions."

The Court reaches the same conclusion with respect to Plaintiff's allegation that the Preliminary Notice of Disciplinary Action she received on February 23, 2000, constituted unlawful retaliatory conduct. Standing alone, this Notice merely served to inform Plaintiff that the County was considering taking disciplinary action against her and therefore could not have had a materially adverse affect on Plaintiff's employment status. More importantly, however, the record contains no evidence that this Notice ever resulted in any actual disciplinary action against Plaintiff or deprived her of subsequent employment opportunities. Plaintiff has, therefore, failed, as a matter of law, to establish that this disciplinary notice amounted to the type of adverse employment action required to state an actionable retaliation claim under Title VII and the NJLAD.

## VII. EMPLOYER LIABILITY UNDER TITLE VII AND THE NJLAD

### A. Title VII

The standard of employer liability under Title VII varies depending on whether the alleged harasser was a supervisor or merely a co-worker. *See Anderson,* 131 F.Supp.2d at 647. Neither the Third Circuit nor the Supreme Court has explicitly defined the term "supervisor" as it is used in this context. The Court, however, need not reach this issue for purposes of this motion, as none of the individually named defendants have challenged Plaintiff's contention that each of them exercised supervisory authority over her during her employment at the Meadowview. Accordingly, the Court will assume, without deciding, that each defendant occupied some type of supervisory role with respect to Plaintiff.

Where the alleged perpetrator of the harassment is a supervisory employee, the analysis set forth by the Supreme Court in *Faragher* and *Ellerth* supplies the appropriate framework for assessing an employer's liability. *Faragher v. City of Boca Raton,* 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Within this framework, an employer is, as a general rule, "subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Cardenas,* 269 F.3d at 260; *see also*

*Hightower v. Roman, Inc.*, 190 F.Supp.2d 740, 751 (D.N.J.2002) (Brotman, J.); *Koschoff v. Henderson*, 109 F.Supp.2d 332, 349 (E.D.Pa.2000) (observing that "where a hostile work environment is created by an immediate or successively higher supervisor, a prima facie case of vicarious liability by the employer exists per se."). An employer may, under certain circumstances, raise an affirmative defense that limits its liability by proving, by a preponderance of the evidence, that it "exercised reasonable care to prevent and correct promptly any sexually [or racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Cardenas*, 269 F.3d at 266.

■ This affirmative defense is unavailable, however, in cases where "the supervisor's harassment culminates in a tangible employment action." *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *see also Durham Life Ins. v. Evans*, 166 F.3d 139, 152 (3d Cir.1999) (observing that "sex-based mistreatment by a supervisor—whether overtly sexual or facially neutral and whether motivated by lust or dislike—creates automatic liability when it rises to the level of a tangible adverse employment action."). Examples of tangible employment actions include employment-related actions such as "discharge, demotion, or undesirable reassignment." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. However, while "direct economic harm is an important indicator of a tangible adverse employment action, it is not the *sine qua non.*

If an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found." *Durham Life Ins.*, 166 F.3d at 153; *see, e.g., Reynolds v. USX Corporation*, 56 Fed.Appx. at 82–83 (characterizing a "disciplinary suspension" as an tangible adverse employment action under Title VII).

■ In the instant case, there is evidence in the record which establishes that Defendant Martello sought to have Plaintiff disciplined following his aggressive and intimidating outburst at the April 1st meeting and that Defendant Atlantic County, relying heavily, if not exclusively, on his allegedly fabricated account of that incident, subsequently suspended Plaintiff for five days. This evidence is sufficient, by itself, to raise a triable issue as to whether Atlantic County, as Plaintiff's employer, can be held vicariously liable for Martello's alleged sexual and racial harassment and hostility. If a jury were to conclude that Martello abused his supervisory authority in a manner which resulted in Plaintiff's suspension, Atlantic County would be precluded from asserting the affirmative defense set forth in *Faragher* and *Ellerth*, thus rendering it "automatically liable" for Martello's harassment. *See Durham Life Ins.*, 166 F.3d at 154 ("The *Faragher/Ellerth* rule is clear: When harassment becomes adverse employment action, the employer loses the affirmative defense ..."). The Court will therefore deny Defendants' motion to the extent that it seeks summary judgment with respect to Plaintiff's Title VII hostile work environment claims against Defendant Atlantic County.[15]

15. Even if the Court were to conclude, on the basis of the summary judgment record, that Defendant Atlantic County is entitled to invoke the affirmative defense set forth in *Faragher* and *Ellerth*, summary judgment would nevertheless be inappropriate at this stage of the litigation, as Atlantic County's brief fails to cite evidence in the record which establishes the two essential elements of that defense. *See Durham Life Ins.*, 166 F.3d at 152

## B. NJLAD

Under the LAD, the nature and scope of an employer's liability for compensatory damages in cases of supervisory harassment is governed by the traditional agency principles set forth in Section 219 of the Restatement (Second) of Agency. *See Gaines v. Bellino*, 173 N.J. 301, 312, 801 A.2d 322 (2002); *Lehmann*, 132 N.J. at 617–619, 626 A.2d 445.[16] Section 219 provides, in relevant part, as follows:

(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.

(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

(a) the master intended the conduct or the consequences; or

(b) the master was negligent or reckless; or

(c) the conduct violated a non-delegable duty of the master; or

(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relationship.

Restatement (Second) of Agency, 219 (1958). Thus, as the Restatement indi-

---

n. 7 (observing that the *Faragher/Ellerth* "affirmative defense remains a *defense* and not an element of the plaintiff's case because the burdens of production and proof remain at all times on the employer") (emphasis in original). For instance, while the County claims to have had formal sexual harassment and discrimination policies and procedures in place during Plaintiff's employment, it has not provided the Court with a copy of those policies and procedures. *See Hurley v. Atlantic City Police Department*, 174 F.3d 95, 118 (observing that "*Ellerth* and *Faragher* do not . . . focus mechanically on the formal existence of a sexual harassment policy, allowing an absolute defense to a hostile work environment claim whenever the employer can point to an anti-harassment policy of some sort."). The record also fails to contain evidence that those policies were communicated to the Dietary Unit's supervisors and staff. *See Faragher*, 524 U.S. at 809, 118 S.Ct. 2275 (concluding "as a matter of law that [plaintiff's employer] could not be found to have exercised reasonable care to prevent [her] supervisor's harassing conduct" where the district court concluded that her employer "had entirely failed to disseminate its policy against sexual harassment" to its employees); *Durham Life Ins.*, 166 F.3d at 162 (Weis, J., concurring) (observing that "an effective employer policy is one that has been disseminated to all employees"); *see also Hightower*, 190 F.Supp.2d at 752 (finding that issues of material fact existed as to whether plaintiffs' employer had taken "reasonable and effective"

steps to prevent discriminatory behavior in the workplace where summary judgment record failed to demonstrate that employer's anti-harassment policy was disseminated to plaintiffs and their co-workers). Moreover, with respect to Plaintiff's sexual harassment hostile work environment claim, Defendants' brief does not reference any evidence indicating that Plaintiff failed to avail herself of the preventative or corrective opportunities made available to her. *See Faragher*, 524 U.S. at 807, 118 S.Ct. 2275 (in order to establish an affirmative defense to liability, an employer must prove, by a preponderance of the evidence, that plaintiff "unreasonably failed to take advantage of [the] preventative or corrective opportunities provided" to her). Indeed, the record, construed in Plaintiff's favor, appears to support the opposite conclusion and quite clearly raises genuine issues of material fact which must be resolved by a jury.

16. In *Lehmann*, the New Jersey Supreme Court held that "in cases of supervisory [ ] harassment, whether the harassment is of the quid pro quo or the hostile work environment type, the employer is *directly and strictly liable for all equitable damages and relief.*" 132 N.J. at 617, 626 A.2d 445 (emphasis added). Equitable relief, the Court observed, includes the restatement of the harassment victim, the discipline, transfer or firing of the alleged harasser, the implementation of preventative and remedial measures, and the provisions of back and/or front pay. *Id.*

cates, in cases where "a supervisory employee is acting within the scope of his or her employment, an employer will be liable if the supervisor's conduct creates a hostile work environment." *Gaines,* 173 N.J. at 312, 801 A.2d 322 (citing *Lehmann,* 132 N.J. at 619, 626 A.2d 445). Furthermore, under the exceptions identified in section 219(2), an employer will also be vicariously liable for harassment which falls outside the scope of a supervisor's employment when "the employer contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship." *Lehmann,* 132 N.J. at 624, 626 A.2d 445; *Gaines,* 173 N.J. at 312, 801 A.2d 322.

An employer may, for instance, be held liable for a supervisor's harassment under the negligence exception set forth in section 219(b) based on "its failure have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint procedures, training, and/or monitoring mechanisms." *Lehmann,* 132 N.J. at 621, 626 A.2d 445; *Mancuso,* at 807 n. 9; *Velez v. City of Jersey City,* 358 N.J.Super. 224, 817 A.2d 409 (2003); *see also Lehmann,* at 620, 626 A.2d 445 (observing that because it is eminently "foreseeable that sexual harassment will occur" in the workplace, "the absence of effective preventative mechanisms will present strong evidence of an employer's negligence"). "Effective preventative mechanisms," the New Jersey Supreme Court has observed, generally consist of four basic components: (1) formal policies which explicitly prohibit workplace harassment; (2) formal and informal complaint structures and procedures for promptly and thoroughly investigating and remediating claims; (3) training which is mandatory for supervisors and managers and made available to all other employees; and (4) some effective "sensing or monitoring mechanisms, to find out if the policies and complaint structures are trusted." *Lehmann,* 132 N.J. at 621, 626 A.2d 445 (citations omitted) (discussing the Restatement's exception for employer "negligence"). Courts have also required that an employer demonstrate that it took affirmative steps to educate its employees about its policies and procedures. *See, e.g., Mancuso,* 193 F.Supp.2d at 802. Thus, it is clear that the mere presence of anti-harassment policies and internal complaint procedures does not, by itself, conclusively demonstrate the absence of negligence on the part of the employer. *See Gaines,* 173 N.J. at 314, 801 A.2d 322 (citing *Lehmann,* 132 N.J. at 621–22, 626 A.2d 445); *see also Newsome v. Administrative Office of the Courts,* 103 F.Supp.2d 807, 822 (D.N.J. 2000) (Greenaway, J.) (observing that the "mere implementation and dissemination of anti-harassment" policies and procedures "does not, as a matter of law, prevent the imposition of employer liability under a negligence theory."); *Velez,* 358 N.J.Super. 224, 235, 817 A.2d 409 (citing *Gaines* for the proposition that "the existence of a sexual harassment policy alone is insufficient to establish [an] affirmative defense to vicarious liability [under the NJLAD] in a hostile work environment claim."). Rather, as the New Jersey Supreme Court has repeatedly stressed, there must be evidence that those policies and procedures have been implemented in such a way as to reflect an "unequivocal commitment from the top management that [the employer's stated intolerance for workplace harassment] is not just words, but backed up by consistent practice." *Lehmann,* 132 N.J. at 621, 626 A.2d 445; *Gaines,* 173 N.J. at 319, 801 A.2d 322.

■ The evidence in the record presently before the Court clearly fails to establish the type of "well-publicized" and "effective" anti-harassment policies and

procedures envisioned by the New Jersey Supreme Court. Defendant Atlantic County has neither provided the Court with a copy of its anti-harassment policies and procedures, nor offered any evidence that it made efforts to educate its employees and supervisory personnel about those policies and complaint mechanisms. *See Lehmann,* 132 N.J. at 621, 626 A.2d 445 (noting that an employer's negligence may be found to have contributed to a supervisor's harassing conduct where the employer has failed to put in place "well-publicized" anti-harassment policies and procedures); *Mancuso,* 193 F.Supp.2d at 802 (noting that an employer generally cannot demonstrate that it exercised reasonable care to prevent or redress a supervisor's harassment absent evidence that it's anti-harassment policies and procedures were effectively communicated to its employees and supervisory staff); *Cf. Faragher,* 524 U.S. at 809, 118 S.Ct. 2275 (holding, as a matter of law, that employer did not exercise reasonable care to prevent supervisor's harassment where employer failed to disseminate its sexual harassment policy to its employees); *Hightower,* 190 F.Supp.2d at 752 (finding a genuine issue of material fact as to whether plaintiffs' employer "established a reasonable and effective method to prevent or correct discriminatory behavior" where the summary judgment record contained no evidence that plaintiffs and their co-workers were made aware of such policies). The record is also silent with respect to whether the County ever provided training for its supervisors and employees to reinforce its espoused anti-harassment policies and promote awareness of available complaint procedures. *See Gaines,* 173 N.J. at 315, 801 A.2d 322 (observing that "factual issues concerning what training, if any, ever was provided by the County" may bear on the reasonableness of employer's efforts to discourage and prevent workplace harassment);

*see also Mancuso,* 193 F.Supp.2d at 805 (finding "significant questions regarding the sufficiency of [employer's] anti-harassment efforts" where employer failed to offer evidence concerning the "substance" and "efficacy" of the training it claimed to have provided to its staff). Accordingly, because it is clear that several issues of material fact exist as to whether Defendant Atlantic County implemented reasonable and effective policies and complaint mechanisms for preventing the type of workplace harassment and discrimination alleged by Plaintiff, the Court will deny Defendants' motion for summary judgment.

## VIII. INDIVIDUAL LIABILITY UNDER TITLE VII AND THE NJLAD

Defendants Martello, Oaks, Ross, and Bennet each move for summary judgment on the grounds that the record fails to provide a basis for holding them individually liable for the unlawful employment actions alleged in Plaintiff's Amended Complaint. For the reasons that follow, Defendants' motions will granted in part and denied in part.

### A. Title VII

The Third Circuit has clearly foreclosed any possibility of individual liability under Title VII. *See Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1078 (3d Cir.1996), *cert. denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997) (concluding that "Congress did not intend to hold individual employees liable under Title VII."); *Dici v. Commonwealth of Pennsylvania,* 91 F.3d 542, 552 (3d Cir. 1996) (holding that individual employees cannot be held liable under Title VII); *see also Mosley v. Bay Ship Management, Inc.,* 174 F.Supp.2d 192, 199–200 (D.N.J. 2000) (noting that "the law in the Third

Circuit is 'settled' and 'dispositive' in foreclosing any possibility of individual liability under Title VII."). Accordingly, the Court will grant summary judgment in so far as Plaintiff seeks to hold Defendants Martello, Oaks, Ross, and Bennet personally liable for the Title VII violations alleged in her Amended Complaint.

## B. NJLAD

### i. *Plaintiff's NJLAD Hostile Work Environment Claims*

██ Plaintiff's state law hostile work environment claims derive from the general anti-discrimination provisions of the NJLAD. *See* N.J.S.A. 10:5–12(a). These provisions, like analogous provisions of Title VII, make it an "unlawful employment practice" for "an employer" to discriminate against an employee with respect to the "terms, conditions or privileges" of her employment on the basis of her race or gender. *Id.* Although the New Jersey Supreme Court has yet to address the question of direct liability for individual employees under N.J.S.A. 10:5–12(a), our Court of Appeals has predicted that, when confronted with the issue, the state Supreme Court will likely conclude that supervisors and other employees cannot be held directly liable as "an employer" under the NJLAD. *See Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 125 (3d Cir.1999) (interpreting N.J.S.A. 10:5–12(a)). In reaching this holding, the Court of Appeals observed the significant similarities between the text of Title VII and the NJLAD's general anti-discrimination provisions:

> While an "employer" may be "one or more individuals" under N.J.S.A. 10:5–5(a), that does not necessarily mean that supervisors, themselves employed by individuals or corporations, are "employers." Title VII defines "employer" to include "a person ... who has fifteen or more employees" or "any agent" of such

a person, 42 U.S.C. § 2000e(b), and it could be subjected to the same analysis the dissent uses to find individual liability possible under LAD.

> We also note that imposing direct liability on supervisors, who are likely to be substantially judgment-proof, will not significantly add to the force of anti-discrimination law, which already gives employers incentives to ban discrimination and monitor supervisors' activities. We think that there is insufficient reason to predict that New Jersey would diverge from the federal scheme on this point. *See, e.g., Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1077–78 (3d Cir.1996). In sum, while the point is close, as well as unclear, we are simply not willing to predict that New Jersey would include supervisors in the statutory definition of "employer."

*Id.* at 125.

The NJLAD does, however, contain a separate provision which expressly contemplates individual liability for supervisors who "aid or abet" an employer's unlawful employment actions. *Hurley,* 174 F.3d at 126. This provision makes it unlawful for *"any person, whether an employer or employee or not,* to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NJLAD], or to attempt to do so." N.J.S.A. 10:5–12(e) (emphasis added). Because the New Jersey Supreme Court has not had occasion to determine the appropriate scope of secondary liability under the NJLAD, here again, this Court must rely on the decisions of our Court of Appeals for guidance.

██ In *Failla v. City of Passaic,* the Court of Appeals examined that text of the NJLAD's "aiding and abetting" provision and predicted that the New Jersey Supreme Court would adopt the standard of secondary liability set forth in the Restatement (Second) of Torts. Under this stan-

dard, an employee can be held liable for "aiding and abetting" a violation of the NJLAD only when it is shown that he "knowingly [gave] substantial assistance or encouragement to the unlawful conduct of his employer." 146 F.3d 149, 158 (3d Cir. 1998); *see also Gardenhire v. New Jersey Mfs. Ins. Co.*, 333 N.J.Super. 219, 228, 754 A.2d 1244 (Law Div.2000) (adopting the Third Circuit's interpretation of N.J.S.A. 10:5–12(e)).[17] The Court stressed that the Restatement, and by extension the NJLAD, requires that the alleged victim of gender or race-based harassment who seeks to hold an individual liable as an "aider and abettor" demonstrate a "heightened" degree of culpability on the part of the offending employee:

> In order to establish individual liability, plaintiff must prove that the individual knows of the principal's discriminatory conduct, knows that such conduct involves a breach of the principal's duty to the plaintiff, and actually assists or encourages that unlawful act. Employees are not liable merely because they had some role, or knowledge, or involvement. Rather, the degree of involvement, knowledge and culpability required as a basis for liability is heightened by the standard that the Restatement sets forth and we adopt. Only those employees who meet this heightened standard will be aiders and abettors. It is important that this standard be set above mere knowledge and/or implementation, lest a reverse respondeat superior liability could be created under the guise of aiding and abetting.

146 F.3d at 159. Thus, for instance, while the Court did not foreclose the possibility that an employee's failure to act might subject him to individual liability under the NJLAD, it emphasized that such liability would attach only under circumstances in which the employee's inaction rises to the level of "substantial assistance or encouragement." *Id.* at 158 n. 11; *see also Hurley*, 174 F.3d at 126.

The Court of Appeals subsequently revisited the issue of secondary liability under NJLAD in *Hurley*. The Court, in refining its previous analysis, concluded that only employees who have been delegated some degree of supervisory authority can be held personally liable under the NJLAD as "aiders and abettors." As the Court explained,

> [U]nder New Jersey law, a nonsupervisory employee cannot be held liable as an aider and abettor for his own affirmative acts of harassment, because such affirmative acts do not substantially assist the employer in *its* wrong, which is its failure to prevent and redress harassment by individual employees. Rather, a nonsupervisory employee's harassment takes advantage of the employer's wrongful conduct; it is the employee who seems to be "aided and abetted" by the employer. *A supervisor, by contrast, may be liable as an aider and abettor for active harassment or knowing and willful inaction, because in either case the supervisor violates his or her duty as a supervisor to prevent and halt harassment.*

174 F.3d at 129 (footnotes omitted and emphasis added); *see also Cardenas*, 269 F.3d at 268 ("a supervisor has a duty under New Jersey law to act against harassment, and a supervisor's violation of

---

**17.** The Third Circuit has identified six factors which may be relevant to the determination of whether a defendant has provided "substantial assistance or encouragement": (1) the nature of the act encouraged; (2) the amount of assistance given by the defendant; (3) his presence or absence at the time of the tort; (4) his relation to the other; (5) his state of mind; and (6) the duration of the assistance provided. *See Hurley*, 174 F.3d at 127 n. 27.

this duty by either deliberate indifference or affirmative harassment subjects the supervisor to LAD liability"). Accordingly, in determining whether the individual employees named as defendants in this action can be held personally liable for contributing to what Plaintiff alleges was a racially and sexually hostile working environment, the Court must first determine which of the Defendants exercised some degree of supervisory authority over Plaintiff and, second, whether genuine issues of material fact exist as to whether those supervisors aided and abetted violations of the NJLAD. *See Santiago v. City of Vineland,* 107 F.Supp.2d 512, 544 (D.N.J.2000) (Orlofsky, J.).

Here again, none of the individually named defendants have denied their role as members of the management staff responsible for supervising Plaintiff and the Dietary Unit's other employees. Accordingly, for purposes of this motion, which requires the Court to view the record in the light most favorable to Plaintiff, the non-moving party, the Court will assume, without deciding, that each of the Defendants occupied some supervisory role with respect to the Plaintiff. The Court's next task, then, is to determine whether the evidence in the record would support a finding that each of the individual defendants "knowingly gave substantial assistance or encouragement" to the alleged harassment and discrimination about which Plaintiff complains.

 As the Court has observed, the record contains evidence that Defendant Martello conducted himself in a manner which contributed to Plaintiff's perception that her work environment had become hostile to female employees. The record also presents genuine issues of material fact with respect to whether Defendants Martello, Oaks, and Ross, contributed to the creation of a racially hostile work environment by harassing Plaintiff on the basis

of her race. Thus, it follows that a rationale factfinder could conclude that these Defendants offered "substantial assistance or encouragement" to the unlawful sexual and racial harassment which Plaintiff claims to have experienced. *See Cardenas,* 269 F.3d at 268 (when a supervisor engages in "affirmative harassment," he violates his "duty under New Jersey law to act against harassment" and thereby subjects himself to individual liability under the NJLAD); *Hurley,* 174 F.3d at 129 (observing that a supervisor may be held personally liable under the NJLAD as an "aidor and abettor" for his own "active harassment"); *see, e.g., Santiago,* 107 F.Supp.2d at 545 (concluding that plaintiff's supervisors could be held liable as aiders and abettors where the record contained evidence that defendants actively engaged in discriminatory conduct toward plaintiff). Accordingly, the Court must deny summary judgment with respect to Plaintiff's NJLAD sexual harassment claim against Defendant Martello and her NJLAD racial harassment claim against Defendants Martello, Oaks, and Ross.

There is, however, no evidence in the record that either Oaks, Ross, or Bennet ever harassed Plaintiff on the basis of her gender. Nor is there evidence that those Defendants ever knew of or offered assistance or encouragement to Martello's alleged harassment. The Court will therefore grant summary judgment with respect to Plaintiff's NJLAD sexual harassment claim against Defendants Oaks, Ross, and Bennet.

The record also lacks evidence that Defendant Bennet discriminated against Plaintiff on the basis of her race or knowingly offered substantial assistance or encouragement to Ross's alleged discriminatory acts. While Bennet may have been present during the meeting in which Defendant Ross allegedly instructed Oaks to omit her positive comments from Plaintiff's

1999/2000 annual performance evaluation, there is no evidence that Bennet knew of the racial hostility Ross had allegedly expressed toward Plaintiff and the Unit's other African–American employees in her conversations with Dennis Maurer. Thus, nothing in the record suggests that Bennet had reason to believe that Ross was breaching her duty not to discriminate against Plaintiff. *See Failla*, 146 F.3d at 158 (holding that an employee's "failure to act" to prevent the alleged harassing or discriminatory conduct of another will subject him to individual liability under the NJLAD only when he "knows that the other's conduct constitutes a breach of [the] duty" not to discriminate) (quoting Restatement (Second) of Torts § 876(b)); *see also id.* at 159 (observing that "an employee cannot be held liable for "aiding and abetting" another's harassing or discriminatory acts "merely because [he] had some role, or knowledge or involvement[;]" rather, plaintiff must demonstrate a degree of culpability which satisfies the heightened standard" set forth by the Restatement). Accordingly, as no reasonable factfinder could conclude based on the available evidence that Bennet acted with "deliberate indifference" to racial harassment or discrimination of which he was or should have been aware, the Court will also grant summary judgment on Plaintiff's NJLAD racial harassment claim against Defendant Bennet. *See Cardenas*, 269 F.3d at 268 (affirming district court's grant of summary judgment with respect to NJLAD claim against supervisory employee where the record offered "no evidence that [defendant] discriminated against [plaintiff] or was *deliberately indifferent* to the discrimination he suffered") (emphasis added).

### ii. *Plaintiff's NJLAD Retaliation Claim*

■ While the general anti-discrimination provisions of the NJLAD prohibit certain unlawful employment actions on the part of "an employer," the statute's anti-retaliation provisions deem it unlawful for "*any person* to take reprisals against any person because that person has opposed any practices or acts" which the Act prohibits. N.J.S.A. 10:5–12(d) (emphasis added); *see also Hurley v. Atlantic City Police Dep't*, 1998 WL 351781 at *13 (D.N.J. 1998) (Irenas, J.) ("Under the LAD … it is unlawful 'for *any person* to take reprisals against any person' based on his protected activities."). Thus, these provisions, like the provisions establishing liability for those employees who "aid" and "abet" an employer's unlawful employment practices, expressly contemplate direct liability for individual supervisory employees. *See Horvath*, 2000 WL 1030357 at *6 (observing that "the NJLAD provides that an unlawful employment action occurs when *a person, whether an employer or employee* takes 'reprisals against any person because that person has'" engaged in statutorily protected activity) (internal quotations and citations omitted). Moreover, New Jersey courts have generally sought to advance the NJLAD's important remedial goals "by historically and consistently interpreting the LAD 'with that high degree of liberality which comports with the preeminent social significance of its purposes and objects.'" *Gardenhire*, 333 N.J.Super. at 225–26, 754 A.2d 1244 (citing *Dale v. Boy Scouts of America*, 160 N.J. 562, 585, 734 A.2d 1196 (1999)). Accordingly, were a jury to conclude that the suspension Plaintiff received following Defendant Martello's outburst at the April 1st meeting constituted unlawful retaliation, Martello could be held liable for his involvement in that retaliatory conduct. Accordingly, the Court will deny summary judgment to the extent that Plaintiff seeks to pursue a claim against Defendant Martello for unlawful retaliation under the NJLAD.

## IX. PUNITIVE DAMAGES

Defendants Atlantic County, Martello, and Bennet, also move for summary judgment with respect to Plaintiff's demand for punitive damages under Title VII and the NJLAD.

### A. Title VII

■ Punitive damages are available in Title VII cases when the defendant employer engages in a discriminatory practice with "malice or reckless indifference to the federally protected rights of an individual." 42 U.S.C. § 1981a(b)(1). In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court held that punitive damages liability can be imposed on an employer when "an employee serving in a managerial capacity committed the wrong while acting within the scope of his employment." *Id.* at 543, 119 S.Ct. 2118. However, the Court further held that "an employer cannot be held vicariously liable for the discriminatory employment decisions of managerial agents where [those] decisions are contrary to the employer's good faith efforts to comply with Title VII." *Id.* at 545, 119 S.Ct. 2118.

Defendant Atlantic County contends that it is entitled to summary judgment with respect to Plaintiff's demand for punitive damages under Title VII because it had anti-harassment and discrimination policies and procedures in place during Plaintiff's employment which evidenced a good-faith effort to comply with Title VII. However, as the Court has already observed, the summary judgment record clearly raises genuine issues of material fact with regard to the reasonableness of the County's efforts to implement those policies and procedures. Accordingly, because the Court cannot conclude, as a matter of law, that Defendant Atlantic County demonstrated a "good-faith" effort to comply with Title VII, the Court will deny that part of Defendants' motion which seeks summary judgment with respect to Plaintiff's demand for punitive damages under Title VII. *See, e.g., Hightower*, 190 F.Supp.2d at 754 (denying summary judgment on plaintiff's demand for punitive damages under Title VII where the record presented genuine issues of material fact as to whether plaintiff's employer had implemented a "reasonable" and "effective" EEO Policy).

### B. NJLAD

■ Under the New Jersey Law Against Discrimination, as under Title VII, "the imposition of vicarious liability for punitive damages [on an employer] based on the misconduct of [one of its] employees requires a distinct method of analysis." *Cavuoti v. New Jersey Transit Corp.*, 161 N.J. 107, 120, 735 A.2d 548 (1999). In *Lehmann*, the New Jersey Supreme Court established "two conditions that must be met as prerequisites to an award of punitive damages in a discrimination suit under [the NJLAD]." *Cavuoti*, 161 N.J. at 112, 735 A.2d 548; *Rendine v. Pantzer*, 141 N.J. 292, 313, 661 A.2d 1202 (1995). These conditions are: (1) "actual participation in or willful indifference to the wrongful conduct on the part of upper management"; and (2) "proof that the offending conduct was especially egregious." *Cavuoti*, 161 N.J. at 112, 735 A.2d 548 (quoting *Lehmann*, 132 N.J. at 623, 626 A.2d 445); *Rendine*, 141 N.J. at 314, 661 A.2d 1202 (same); *see also Mancuso*, 193 F.Supp.2d at 807.

■ The task of determining whether an offending employee should be considered part of "upper management" is highly fact-sensitive and requires that the Court evaluate whether the employee had "sufficient authority so that the imputation of damages against the employer is fair and reasonable." *Cavuoti*, 161 N.J. at 126, 735

A.2d 548; *see also Lockley v. Turner,* 344 N.J.Super. 1, 20, 779 A.2d 1092 (App.Div. 2001).[18] As the Court observed in *Cavuoti,*

> it is fair and reasonable to conclude that upper management [will] consist of those responsible to formulate the organization's anti-discrimination policies, provide compliance programs and insist on performance (its governing body, its executive officers) and those to whom the organization has delegated the responsibility to execute its policies in the workplace, who set the atmosphere or control the day to day operations of the unit (such as heads of departments, regional managers, or compliance officers).

161 N.J. at 128–29, 735 A.2d 548. However, the concept of "upper management is not confined to those individuals occupying the top-most tier in an organizational chart," it also "includes those individuals who have 'significant power, discretion and influence within their own departments.'" *Lockley,* 344 N.J.Super. at 20, 779 A.2d 1092 (quoting *Cavuoti,* 161 N.J. at 123, 735 A.2d 548). Thus, for instance, "an employee on the second-tier of management" may be considered a member of "upper management" if he or she possesses "either: (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote and discipline; or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination free workplace." *Cavuoti,* 161 N.J. at 129, 735 A.2d 548.

▪ As for the second pre-requisite identified by the New Jersey Supreme Court, a violation of the NJLAD may be considered "especially egregious" where there is proof that a defendant acted with "actual malice" or "a wanton and wilfull disregard of the rights of another." *Cavuoti,* 161 N.J. at 120 n. 2, 735 A.2d 548; *see also Santiago,* 107 F.Supp.2d at 570. The question of whether an alleged victim of sexual and racial harassment has alleged the type of wanton, reckless, or malicious conduct necessary to support an award of punitive damages" must ordinarily be resolved by a jury. *See, e.g., Spragg v. Shore Care,* 293 N.J.Super. 33, 59, 679 A.2d 685 (App.Div.1996) (observing that summary judgment is "particularly inappropriate" on the question of the availability of punitive damages "where subjective elements such as intent and motivation are involved"); *Weiss v. Parker Hannifan Corp.,* 747 F.Supp. 1118, 1135 (D.N.J.1990) (Gerry, C.J.) ("Under New Jersey law, the exceptional nature of a given case and the wanton or malicious nature of the defendant's conduct are questions for the finder of fact."); *see also Santiago,* 107 F.Supp.2d at 570 (noting that "the issue of punitive damages is [typically] a fact question which should be decided by a jury"); *Domm v. Jersey Printing Co., Inc.,* 871 F.Supp. 732, 739 (D.N.J.1994) (same).

▪ In the instant case, the record before the Court presents genuine issues of material fact with regard to whether any of the defendants, particularly Defendant Ross, the deputy director of the County's Department of Human Services, possessed sufficient authority to be considered a member of "upper management" for purposes of awarding punitive damages against Defendant Atlantic County, Plaintiff's employer. *See Lockley,* 344 N.J.Super. at 20, 779 A.2d 1092 (observing that

---

**18.** The New Jersey Supreme Court has identified three public policy considerations which have guided its analysis of this issue: "(1) the purposes of the LAD; (2) the purposes of punitive damages; and (3) the demands of justice for a broadly-based definition that will be applicable to different employment structures." *Cavuoti,* 161 N.J. at 122, 735 A.2d 548.

"assigning an individual to the ranks of upper management involves a sensitive analysis of the tasks performed by that person, not mere reliance on the job title carried.").[19] The question of whether the conduct Plaintiff has alleged is sufficiently "wanton" or "reckless" to support an award of punitive damages must also be reserved for trial. Accordingly, the Court will deny that part of Defendants' motion which seeks summary judgment with respect to Plaintiff's demand for punitive damages under the NJLAD.

## X. PLAINTIFF'S CLAIMS UNDER 42 U.S.C. § 1983

Count II of Plaintiff's Amended Complaint asserts claims under 42 U.S.C. § 1983 based on allegations that Defendants conduct violated rights guaranteed her under the Equal Protection and Due Process clauses of the Fourteenth Amendment. Defendants Atlantic County, Martello, and Bennet, contend that summary judgment must be granted with respect to Plaintiff's § 1983 claims because "plaintiff cannot bring a constitutional claim under § 1983 where the only rights Defendant is alleged to have abridged are those statutory rights created by Title VII." (Br. in Supp. Mot. Sum. Judg. on behalf of Defendants Atlantic County, Martello, and Bennet, at p. 20). Defendants further argue that, even if Title VII does not preempt Plaintiff's § 1983 claims, summary judgment must nevertheless be granted because the record fails to contain evidence sufficient to make out a *prima facie* violation of Plaintiff's constitutional rights. For the reasons set forth below, this part

of Defendants' motion will be granted in part and denied in part.

### A. The Interplay Between Title VII and 42 U.S.C. § 1983

▬ Defendants first argue that Plaintiff's § 1983 claims are essentially consumed within her Title VII claims because they rely on the same underlying facts and seek to vindicate rights and interests protected by Title VII's comprehensive remedial scheme. However, Defendants' argument glosses over an important distinction frequently drawn by courts which have examined the relationship between Title VII and § 1983. Defendants correctly observe that courts have often precluded plaintiffs from pursuing § 1983 claims based on the alleged violation of rights created by Title VII. *See, e.g. Foster v. Wyrick*, 823 F.2d 218, 221 (8th Cir.1987) (a plaintiff "may not circumvent Title VII's filing requirement by utilizing § 1983 as a vehicle for asserting his Title VII claim"); *Day v. Wayne County Board of Auditors*, 749 F.2d 1199, 1204 (6th Cir.1984) (holding that "Title VII provides the exclusive remedy when the only § 1983 cause of action is based on a violation of Title VII"); *see also Price v. Delaware Dept. of Correction*, 40 F.Supp.2d 544, 558 (D.Del.1999) (plaintiff may not use § 1983 to bring an employment discrimination claim for unlawful retaliation); *Bair v. City of Atlantic City*, 2000 WL 1897391 (D.N.J. June 16, 2000) (Kugler, M.J.) (observing that "courts have [generally] held that a plaintiff cannot use Section 1983 as a vehicle to seek redress for a right that is created by Title VII.").

---

**19.** Indeed, while Defendants argue that neither Martello, Oaks, or Ross, can be considered part of the Meadowview's "upper management," Defendants' brief fails to offer any specific argument on this point and contains not a single reference to the evidence in the record before the Court. (*See* Br. in Supp. of Mot. for Sum. Judg. on Behalf of Defendants

Atlantic County, Martello, and Bennet at p. 28). On a motion for summary judgment, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact with regard to a particular element of the Plaintiff's damage claim. Defendants terse and conclusory arguments clearly fail to satisfy this burden.

However, the holdings in these cases have, with few exceptions, turned "on a finding that the right at issue existed *exclusively* as a creation of Title VII." *Bair,* 2000 WL 1897391 (emphasis added). Thus, for instance, courts have recognized that employment discrimination claims based on theories of unlawful retaliation or disparate impact—claims which owe their existence to Title VII and are not recognized under general constitutional principles—may not be pursued via § 1983. *See, e.g., Long v. Laramie County Community College District,* 840 F.2d 743, 752 (10th Cir. 1988) (holding that allegations of employer retaliation are properly governed by Title VII and cannot support a claim under § 1983); *Foster,* 823 F.2d at 220–21 (dismissing § 1983 claim alleging employment discrimination based on a "disparate impact" theory because, while such a claim is cognizable under Title VII, it is not recognized under principles of constitutional law); *Day,* 749 F.2d at 1205 (holding that where the only unlawful employment practice an employer is alleged to have committed is retaliation for filing a charge of discrimination under Title VII, plaintiff's allegations cannot provide the basis for a § 1983 claim); *Price,* 40 F.Supp.2d at 558 (concluding that "[a] claim of retaliation cannot be the sole basis for a section 1983 claim where there is no violation of the Constitution or federal law, other than the retaliation provision of Title VII").

■ Notwithstanding Defendants arguments to the contrary, these cases do not stand for the much broader proposition that Title VII and § 1983 are necessarily mutually exclusive. See Price, 40 F.Supp.2d at 557 (noting that Title VII "does not categorically preempt all § 1983 claims based on employment discrimination"). The Third Circuit, as well as the vast majority of courts in other jurisdictions, have held that when a plaintiff alleges conduct which violates both rights guaranteed by the Constitution and the statutory rights created by Title VII, a plaintiff may bring either a Title VII claim, a § 1983 claim, or both. *See Bradley v. Pittsburgh Board of Education,* 913 F.2d 1064, 1078–79 (3d Cir.1990) (concluding that teacher's § 1983 racial discrimination claim was not preempted by Title VII where she sought to vindicate rights grounded in both Title VII and the Equal Protection Clause of the Fourteenth Amendment) (citing for support the decisions of other courts of appeal in the Fourth, Fifth, Sixth, Seventh, Ninth, and Tenth Circuits). Language from the Tenth Circuit's decision in *Notari v. Denver Water Dept.,* 971 F.2d 585 (10th Cir. 1992) most clearly articulates this important distinction between § 1983 claims based on rights created exclusively by Title VII and those which seek to vindicate rights or interests which also exist "independent" of Title VII's remedial provisions:

> [T]he basis for a § 1983 claim is "independent" from Title VII when it rests on substantive rights provisions outside Title VII—that is, when it rests on a constitutional right or a federal statutory right other than those created by Title VII. *We emphasize that the basis of a § 1983 claim may be independent of Title VII even if the claims arise from the same factual allegations and even if the conduct alleged in the § 1983 claim also violates Title VII.* For example, a § 1983 claim of racial discrimination is independent of a statutory disparate treatment claim arising out of the same set of facts because the § 1983 claim is substantively grounded in the Equal Protection Clause of the Fourteenth Amendment, whereas the disparate treatment claim flows from Title VII. Because the substantive legal standards that govern these claims emanate from different sources, as long as the substantive legal bases for the claims are dis-

tinct, our "independence" requirement is satisfied and Title VII does not foreclose an employment discrimination plaintiff's § 1983 claim.

971 F.2d at 587; *see also Day*, 749 F.2d at 1205 ("Where an employee establishes employer conduct which violates both Title VII and rights derived from another source, [such as] the Constitution or a federal statute, ... the claim based on the other source is independent of the Title VII claim, and the plaintiff may seek remedies provided by § 1983 in addition to those created by Title VII.").

■■■ Here, plaintiff has alleged racial and sexual harassment in public employment, conduct which not only violates the statutory protections of Title VII, but can also amount to a deprivation of the equal protection rights afforded under the Fourteenth Amendment.[20] *See Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60

L.Ed.2d 846 (1979); *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir.1990); *Annis v. County of Westchester*, 36 F.3d 251, 254 (2d Cir.1994); *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir.1994); *Pontarelli v. Stone*, 930 F.2d 104, 113–14 (1st Cir. 1991). Accordingly, she is not precluded from pursuing those claims under both Title VII and § 1983. *Bradley*, 913 F.2d at 1079 (observing that "the comprehensive scheme provided in Title VII does not preempt section 1983, and that discrimination claims may be brought under either statute or both."); *see also Bair*, 2000 WL 1897391 ("plaintiffs alleging sexual harassment and discrimination have been permitted to file claims under both Title VII and Section 1983, even when those claims are based upon an identical set of facts") (citing *Southard v. Texas Board of Criminal Justice*, 114 F.3d 539, 550–551 (5th Cir. 1997)); *Reynolds v. Borough of Avalon*, 799 F.Supp. 442, 449 (D.N.J.1992) (noting

---

**20.** Plaintiff argues that Defendants' alleged discriminatory conduct also constitutes a violation of rights guaranteed by the substantive component of the Fourteenth Amendment's Due Process Clause. However, the Supreme Court and our Court of Appeals have held that when a particular clause or amendment of the Constitution "provides an explicit textual source of constitutional protection against a particular sort of government behavior," it is that clause or amendment and "not the more generalized notion of substantive due process" which governs claims arising out of such behavior. *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); *see also Torres v. McLaughlin*, 163 F.3d 169, 172 (3d Cir.1998) ("claims governed by explicit constitutional text may not be grounded in substantive due process"). Accordingly, because the rights and interests which plaintiff seeks to vindicate already find protection in the specific guarantees of the Fourteenth Amendment's Equal Protection Clause, Plaintiff's sexual and racial harassment claims cannot also be anchored in the more abstract and elastic concept of substantive due process. *See, e.g., Nicholas v. Penn-*

*sylvania State University*, 227 F.3d 133, 2000 WL 1285698 at *9 n. 3 (3d Cir. Sept.13, 2000) (concluding that the First Amendment, and not the substantive component of the Due Process Clause, governed plaintiff's claim that his termination was in retaliation for conduct protected by the First Amendment). Moreover, it is by now firmly established that "the substantive component of the due process clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that *shocks the conscience*." *Allah v. Stachelek*, 1998 WL 281930 at *11 (E.D.Pa. May 29, 1998) (emphasis added) (citing *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir.1994) (en banc)). The record in this case, even when viewed in the light most favorable to Plaintiff, does not contain evidence of the type of "shocking" and "arbitrary" abuse of governmental power necessary to invoke the substantive protections of the Due Process Clause. The Court is therefore satisfied that summary judgment would be warranted even if Plaintiff could properly pursue a substantive due process claim. The Court will therefore grant summary judgment with respect to the substantive due process claim contained in Count II of Plaintiff's Amended Complaint.

that the fact that a sexual harassment claim is actionable under Title VII does not preclude plaintiff from bringing that same claim under § 1983). However, to the extent that plaintiff also seeks to pursue her retaliation claims under § 1983, those claims must be dismissed as a matter of law. *See Day,* 749 F.2d at 1205; *Price,* 40 F.Supp.2d at 558.

## B. Sufficiency of the Evidence Underlying Plaintiff's § 1983 Equal Protection Claims

Having concluded that Plaintiff is not precluded from pursuing her sexual and racial harassment claims under § 1983, the Court must now determine whether there is sufficient evidence in the record to support imposing liability on Defendants for the alleged violations of Plaintiff's right to equal protection.

### i. *Individual Liability under § 1983*

In order to establish the liability of an individual supervisory employee for sexual or racial discrimination or harassment under § 1983, "there must be some affirmative conduct by the supervisor that played a role in the discrimination." *Andrews,* 895 F.2d at 1478 (citing *Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)); *see also Foster v. Township of Hillside,* 780 F.Supp. 1026, 1045 (D.N.J.1992) (Wolin, J.), *aff'd,* 977 F.2d 567 (3d Cir.1992). "The necessary [degree of personal] involvement can be shown in two ways, either 'through allegations of personal direction or of actual knowledge and acquiescence,' or through proof of direct discrimination [or harassment] by the supervisor." *Andrews,* 895 F.2d at 1478 (quoting *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988)). Any allegations concerning the "existence of an order or acquiescence leading to discrimination must be pled and proven with appropriate specificity." *Andrews,* 895 F.2d at 1478.

Here, Plaintiff has produced evidence that she was harassed by Defendant Martello on the basis of both her race and her gender. She has also produced evidence of race-based harassment and hostility on the part of Defendants Oaks and Ross. The Court must therefore deny summary judgment to the extent that Plaintiff seeks to hold Defendants Martello, Oaks, and Ross liable under § 1983 for the alleged violation of her right to equal protection.

The evidence in the record does not, however, raise a genuine issue of material fact with respect to whether Defendant Bennet was personally involved in conduct which violated Plaintiff's right to equal protection. Plaintiff does not allege, much less produce evidence, that Bennet was in any way involved in the sexual harassment she claims to have experienced. Nor has Plaintiff cited to any evidence which establishes, with "appropriate specificity," that Bennet personally directed or had actual knowledge of the racial harassment and hostility allegedly directed at Plaintiff by Defendants Martello, Oaks, and Ross. Accordingly, the Court will enter summary judgment with respect to Plaintiff's § 1983 claim against Defendant Bennet.

### ii. *Municipal Liability under § 1983*

A municipality cannot be held vicariously liable under § 1983 for the unconstitutional actions of its employees under a theory of *respondeat superior;* rather, "[t]o obtain a judgment against a municipality, a plaintiff must prove that the municipality itself supported the violation of rights alleged." *Andrews,* 895 F.2d at 1480 (citing *Monell v. Department of Social Services,* 436 U.S. 658, 692–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Thus, § 1983 liability attaches to a municipality only when " 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or

acts may fairly be said to represent official policy, inflicts the [constitutional] injury' complained of." *Robinson,* 120 F.3d at 1295 (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018).

In the context of a sexual or racial harassment claim, a municipal custom or policy can be established in one of two ways. Plaintiff can offer proof that "a decisionmaker possessing final authority to establish official municipal policy ... issue[d] an official proclamation policy or edict" which permitted, encouraged, or supported discriminatory harassment in the workplace. *Andrews,* 895 F.2d at 1480; *Mobley,* 2000 WL 363692 at \*3. Alternatively, plaintiff can establish municipal liability by producing proof that the racial or sexual harassment alleged reflects a "practice" or a "course of conduct" among municipal officials which is "so permanent and well settled as to virtually constitute law." *Andrews,* 895 F.2d at 1480; *Mobley,* 2000 WL 363692 at \*3.

 Under either approach, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews,* 895 F.2d at 1480; *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (stating that "municipal liability under 1983 attaches where—and only where—a deliberate choice to follow a course of action is made ... by the official or officials responsible for establishing final policy with respect to the subject matter in question"); *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990) ("a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom."); *see also King v. City of Philadelphia,* 2002 WL 1277329 at \*16 (E.D.Pa. June 4, 2002) ("plaintiff must establish that a policymaker is responsible for either the

policy ... or the custom" about which she complains). A "policymaker" is an "official [who] has final, unreviewable discretion to make a decision or take an action." *Id.* at 1481. Because the Plaintiff has failed to offer evidence that any of the named defendants in this action possessed final decisionmaking authority with regard to the County's anti-harassment policies, practices, and procedures, the Court will grant summary judgment with respect to Plaintiff's § 1983 claim against Defendant Atlantic County. *See, e.g., Griffith v. Philadelphia Prison Systems,* 2001 WL 876804 at \*2 (E.D.Pa. May 18, 2001) (granting summary judgment on plaintiff's § 1983 claim against city agency where plaintiff failed to establish that any of the agency's policymakers were involved in or responsible for the alleged sexual harassment); *Santiago,* 107 F.Supp.2d at 540 (granting summary judgment on plaintiff's § 1983 race discrimination claim where plaintiff "failed to point to any evidence in the summary judgment record which would lead a factfinder to conclude that [any of the individual defendants] was a final policymaker for the municipal defendant"); *Mobley v. City of Atlantic City Police Dep't,* 2000 WL 363692 (D.N.J. March 30, 2000) (dismissing plaintiff's claims against the Atlantic City Police Department where plaintiff failed to meet her burden of proving fault on the part of a police department official with final policymaking authority).

## XI. CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment will be granted in part and denied in part. The Court will enter an appropriate order.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**THIS MATTER** having come before the Court on Defendants' motions for sum-

mary judgment pursuant to Fed.R.Civ.P. 56;

The Court having considered the submissions of the parties; and

For the reasons set forth in the Court's opinion of this date;

**IT IS** on this 12th day of May, 2003, HEREBY

**ORDERED** that the part of the motion filed on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment with respect Plaintiff's genderbased hostile work environment claims under Title VII and the NJLAD is **DENIED**; and

**IT IS FURTHER ORDERED** that the part of the motion filed on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment with respect Plaintiff's race-based hostile work environment claims under Title VII and the NJLAD is **DENIED**; and

**IT IS FURTHER ORDERED** that the part of the motion filed on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment with respect to Plaintiff's retaliation claims is **DENIED** to the extent Plaintiff alleges that the five-day suspension she received on April 18, 1997, constituted unlawful retaliation under Title VII and the NJLAD; and

**IT IS FURTHER ORDERED** that the part of the motion on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment with respect to Plaintiff's retaliation claims is **GRANTED** to the extent Plaintiff alleges that the Preliminary Notice of Disciplinary Action she received on February 23, 2000, and the annual performance evaluations issued on March 17, 2000, and March 30, 2000, constituted unlawful retaliatory conduct under Title VII and the NJLAD; and

**IT IS FURTHER ORDERED** that the part of the motion filed on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment with respect to Defendant Atlantic County on Plaintiff's race and gender-based hostile work environment claims under Title VII and the NJLAD is **DENIED**; and

IT IS FURTHER ORDERED that the part of the motion on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment with respect to Defendants Wilt Bennet and Sal Martello on Plaintiff's hostile work environment and retaliation claims under Title VII is **GRANTED**, as there is no liability for individual supervisory employees under Title VII; and

**IT IS FURTHER ORDERED** that the part of the motion on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment with respect to Defendant Wilt Bennet on Plaintiff's gender and race-based hostile work environment claims under the NJLAD is **GRANTED**; and

**IT IS FURTHER ORDERED** that the part of the motion on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment with respect to Defendant Wilt Bennet on Plaintiff's retaliation claims under the NJLAD is **GRANTED**; and

**IT IS FURTHER ORDERED** that the part of the motion on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment with respect to Defendant Sal Martello on Plaintiff's race and gender-based hostile work environment claims under the NJLAD is **DENIED**; and

**IT IS FURTHER ORDERED** that the part of the motion on behalf of Defendants Atlantic County, Wilt Bennet, and Sal

Martello, which seeks summary judgment with respect to Defendant Sal Martello on Plaintiff's retaliation claims under the NJLAD is **DENIED**; and

**IT IS FURTHER ORDERED** that the part of the motion on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment with respect to Plaintiff's demand for punitive damages under Title VII and the NJLAD is **DENIED**; and

**IT IS FURTHER ORDERED** that the part of the motion on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment with respect to Plaintiff's retaliation claims under 42 U.S.C. § 1983 is **GRANTED**, as those claims are preempted by Title VII; and

**IT IS FURTHER ORDERED** that the part of the motion on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment with respect to Plaintiff's substantive due process claim under 42 U.S.C. § 1983 is **GRANTED**, as that claim is subsumed within Plaintiff's equal protection claims; and

**IT IS FURTHER ORDERED** that the part of the motion on behalf of Defendants Atlantic County, Wilt Bennet, and Sal Martello, which seeks summary judgment on Plaintiff's racial and sexual harassment claims under 42 U.S.C. § 1983 is **GRANTED** with respect to Defendants Atlantic County and Wilt Bennet and **DENIED** with respect to Defendant Sal Martello; and

**IT IS FURTHER ORDERED** that the part of Defendant Joyce Ross's motion which seeks summary judgment with respect to Plaintiff's hostile work environment and retaliation claims under Title VII is **GRANTED**, as there is no liability for individual supervisory employees under Title VII; and

**IT IS FURTHER ORDERED** that the part of Defendant Joyce Ross's motion which seeks summary judgment on Plaintiff's claims for hostile work environment and retaliation under the NJLAD is **GRANTED** with respect to Plaintiff's gender-based hostile work environment claim and retaliation claims and **DENIED** with respect to Plaintiff's race-based hostile work environment claim; and

**IT IS FURTHER ORDERED** that the part of Defendant Geri Oak's motion which seeks summary judgment on Plaintiff's claims for hostile work environment and retaliation under the NJLAD is **GRANTED** with respect to Plaintiff's gender-based hostile work environment claim and retaliation claim and **DENIED** with respect to Plaintiff's race-based hostile work environment claim; and

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** in so far as Plaintiff seeks to assert claims under Title VII against Defendant Geri Oaks, as there is no liability for individual supervisory employees under Title VII; and

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** in so far as Plaintiff seeks to assert a claim for hostile work environment sexual or racial harassment against Defendant Wilt Bennet under 42 U.S.C. § 1983; and

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** in so far as Plaintiff seeks to assert a claim for hostile work environment sexual harassment against Defendants Geri Oaks and Joyce Ross under 42 U.S.C. § 1983.[21]

---

**21.** To summarize, the following claims survive Defendants' motions for summary judgment: (1) Plaintiff's Title VII claims for hostile work environment racial and sexual harassment and unlawful retaliation against

Defendant Atlantic County; (2) Plaintiff's NJLAD claim for hostile work environment sexual harassment against Defendants Atlantic County and Sal Martello; (3) Plaintiff's NJLAD claim for hostile work environment racial harassment against Defendants Atlantic County, Sal Martello, Geri Oaks, and Joyce Ross; (4) Plaintiff's NJLAD claim for unlawful retaliation against Defendants Atlantic County and Sal Martello; (5) Plaintiff's § 1983 claim for hostile work environment sexual harassment against Defendant Sal Martello; and (6) Plaintiff's § 1983 claim for hostile work environment racial harassment against Defendants Sal Martello, Geri Oaks, and Joyce Ross.